PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4553
No. 13-1119
_____

UNITED STATES OF AMERICA

v.

RONALD OTTAVIANO,

Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 10-cr-00485)
District Judge:  Honorable William J. Martini
_____

Argued September 24, 2013
Before:  AMBRO, FISHER and HARDIMAN, *Circuit
Judges*.

(Filed:  December 24, 2013)

Mark E. Coyne (Argued)
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
        *Attorneys for Plaintiff-Appellee*

Mark A. Berman (Argued)
Hartmann, Doherty, Rosa & Berman
65 Route 4 East
River Edge, NJ 07661
        *Attorneys for Defendant-Appellant*

_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

Ronald Ottaviano appeals his judgment of conviction for mail and wire fraud, money laundering, tax evasion, and conspiracy to defraud the Internal Revenue Service. Ottaviano raises various constitutional and legal challenges to the conduct of his trial. Because we are unpersuaded that the District Court committed reversible error, we will affirm.

I

Ottaviano is one of those peculiar Americans who does not believe himself bound by United States tax law. Not content to subject only himself to the penalties that flow inevitably from this belief, Ottaviano marketed his views to others for his own financial gain. Through his company, Mid-

2

Atlantic Trusts and Administrators, Ottaviano offered financial products he claimed would help others elude the IRS and have the government pay their debts.

Mid-Atlantic's principal offering was the "Pure Trust Organization" (PTO), which Ottaviano marketed as a means to hide assets from creditors and the IRS. Although PTOs appeared to be legitimate trusts for which Ottaviano and his company would act as trustees, in actuality customers had unlimited access to and control over the accounts—which made them sham trusts. Mid-Atlantic charged customers $3,000 to start a PTO, after which the company would open a bank account for the customer, often using a false employer identification number and representing that someone other than the customer had "created" the PTO or exchanged assets into it. Mid-Atlantic would then give the customer a debit card, checkbooks, and the online account password, as well as stamps bearing the trustees' signatures, giving customers full control of the assets.

To maintain the appearance of propriety, PTO customers' bank statements were mailed to Ottaviano's home before he forwarded them to customers. Mid-Atlantic also gave customers an elaborate binder of "trust documents" with an "official" section in the front and secret instructions in the back, behind a page prominently labeled "KEEP THIS MANUAL PRIVATE." This section explained that customers could access money in the account whenever and however they wanted as long as they made it appear as if the trustees were making the decisions.

Ottaviano posted false testimonials on Mid-Atlantic's website and referred to them in a podcast to reassure customers about PTOs. He also claimed the PTOs had

3

experienced "just three challenges, but . . . stood up each time," despite knowing that the IRS considered them a sham.

In 2007, after attending a seminar hosted by a well-known tax protestor, Ottaviano and his business partner also began offering a debt-elimination plan called "Beneficiaries in Common" (BIC). Inspired by "redemption theory," which posits that the Uniform Commercial Code can be used to access secret bank accounts maintained by the government in every citizen's name, Ottaviano marketed BIC using an elaborate story: When the United States abandoned the gold standard in 1933, the country went bankrupt and the citizenry became debtors. At that point, the U.S. Treasury created secret accounts for each citizen, tied to Social Security numbers or birth certificates. By filing certain documents with the federal and state governments, a citizen could access his account and transform himself from debtor to creditor, forcing the U.S. Treasury to take out millions of dollars and pay off customers' "public debts," such as mortgages, credit cards, taxes, and criminal fines and penalties.

As far-fetched as this sounds, unscrupulous and/or credulous souls paid Mid-Atlantic $3,500 each ($5,000 if purchased jointly) to participate. Ottaviano bolstered his sales pitch by falsely claiming that customers had successfully satisfied mortgages using BIC, that he had successfully used both BIC and PTOs to eliminate his own tax liability and discharge his own debt, and that the Treasury Department had assured him BIC was legitimate. Ottaviano also misrepresented to customers that he had graduated from college and law school, was a certified financial planner and certified to represent taxpayers before the IRS, and was backed by a staff of certified public accountants. In truth,

Ottaviano had never even attended college, notwithstanding the fake Villanova University diploma displayed in his office.

After customers bought into BIC, Ottaviano would guide them through a lengthy process. First, Mid-Atlantic provided a $300 million "indemnity bond" for the customer to submit to the Secretary of the Treasury. According to Ottaviano, if the Secretary did not reject the bond in 15 days, it was accepted, and the Secretary had to open an account in the customer's name. Next, the customer "funded" the new account by submitting a $50 million, Mid-Atlantic-supplied bond to the Treasury, supposedly to authorize the government and customer to each spend up to $25 million. After enough time passed for the bond to be "processed," the customer would be "bonded" and could use Mid-Atlantic-supplied promissory notes against the $25 million. The initial BIC fee included two promissory notes. Additional notes cost $500 each. Mid-Atlantic began sending the U.S. Treasury thousands of "bonds" on behalf of hundreds of customers.

Unsurprisingly, BIC was not effective. Customers who tried to use it to satisfy debts received predictable responses from financial institutions and from the government warning them that BIC was a fraud and that the so-called bonds were worthless. Ottaviano received numerous emails informing him that BIC was likely illegal, yet continued to sell it to new customers. Meanwhile, the Mid-Atlantic offices and staff were flooded with phone calls, letters, faxes, and email from frustrated customers.

Ottaviano's scheme began to unravel in early 2008, when a customer warned Mid-Atlantic office manager Susan McDermott that BIC might be an illegal scam. McDermott and a coworker followed up by searching for more

information online and shared what they learned with other colleagues, as well as with Ottaviano and his wife. Soon thereafter, McDermott and the coworker quit their jobs and reported Ottaviano's activities to authorities.

The IRS Criminal Investigation Division had also been probing Ottaviano's business dealings and in the fall of 2008 executed search warrants at his home, a mailbox, and Mid-Atlantic's office, seizing computers and documents. This and later searches unearthed a wealth of evidence, including additional customer complaints and notices from banks and other companies warning that BIC notes and bonds were "irrelevant gibberish" and "frivolous." Even after the warrants were served, however, Ottaviano continued to promote BIC and PTOs, including to an undercover agent posing as a prospective customer. Among other things, Ottaviano told the agent how a customer could really control the PTO, although "the way it's set up, and the way all the documents are, nobody could ever prove that."

In 2010, Ottaviano was charged with one count of conspiracy to defraud the United States under 18 U.S.C. § 371, eight counts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, one count of money laundering under 18 U.S.C. § 1957, and two counts of tax evasion under 26 U.S.C. § 51. The indictment also sought forfeiture of both the fees Mid-Atlantic received from 2005 to July 2010 and the Delaware beach house that Ottaviano bought using some of the proceeds.

A jury trial began in May 2011 before Judge William J. Martini of the District of New Jersey. Ottaviano was tried with four codefendants, all of whom were represented by counsel. Ottaviano opted to represent himself, with court-

6

appointed standby counsel available to serve as a resource. At trial, the Government presented extensive documentary evidence detailing Ottaviano's role as the architect of the scheme, as well as testimony from seven IRS representatives, three former employees (including his former office manager, Susan McDermott), four BIC customers who described their negative experiences, and two Ottaviano acquaintances who debunked testimonials Ottaviano had falsely attributed to them.

To further undermine Ottaviano's defense that he had acted out of a good-faith belief that PTOs and BIC were valid, prosecutors presented evidence showing that he had attempted to hide Mid-Atlantic's activities by installing its real computer server in a crawl space above the company's office while placing a dummy server downstairs. The Government also introduced recordings of Ottaviano promoting PTOs and BIC between 2007 and 2009, as well as Ottaviano's conversations with the undercover agent, his meetings with the IRS, and jailhouse calls to his wife.

Initially, the trial proceeded without incident, even with Ottaviano representing himself, and the transcript indicates that Judge Martini acted as a neutral, patient, and accommodating arbiter. After the Government rested, Ottaviano mounted his defense. He ultimately called thirteen witnesses, but had difficulty getting them to appear on the right day and time. With the trial approaching a fourth week, Judge Martini's patience began to wear thin. Despite Ottaviano's promise to show that some BIC instruments worked, his witnesses testified only that Ottaviano had not guaranteed them BIC would work, and no one testified that

7

BIC had satisfied their debts.[1] At various points during defense witnesses' direct and cross-examinations, Judge Martini chimed in with skeptical questions that apparently stemmed from a desire to clarify rambling or nonsensical testimony.

The District Court's most significant intervention occurred when Ottaviano took the stand in his own defense. As standby counsel read questions from a script Ottaviano had written, the District Court interjected early and often. The judge's first question came on the second page of Ottaviano's testimony, in a preliminary part of the direct examination where Ottaviano was explaining his work history. "Wait," the Court interjected. "That's why you put down you were a college graduate on a resume when you weren't. Correct?" "Yes," Ottaviano replied, and the testimony continued.

About twenty pages into the direct examination, Ottaviano began to describe how he sent a letter to the Treasury Secretary about BIC. Standby counsel attempted to introduce the letter, at which point the Government said it did not have a copy. The jury was excused, and the Court ordered Ottaviano out of the courtroom so the judge and lawyers could discuss the letter's origins. Ottaviano was absent for about five pages of transcript, during which time an attorney for another defendant observed: "This may be none of my business but just a caution: He's pro se and we're arguing legal issues." Judge Martini replied that standby counsel was present and that he wanted Ottaviano outside the courtroom

---

[1] One witness testified that BIC had paid off some of his outstanding taxes, but on cross-examination he conceded that he had no proof of that and still owed the IRS $73,000 and had a lien on his house.

for a reason. Ottaviano returned shortly thereafter, and he, the judge, and the attorneys continued to discuss the letter outside the presence of the jury. The judge decided to admit the letter, at which point the jury returned and the direct examination continued.

Soon after the letter was admitted into evidence, the Court began asking Ottaviano skeptical questions about it. After Ottaviano testified that he had never filed a tax return and that he did not believe in federal income tax liability, the judge reminded the jury that the Court would provide them with the law on income tax obligations, regardless of other people's opinions. The direct examination then concluded with little interruption, with the District Court giving Ottaviano fairly wide latitude to explain the basis for his beliefs and the financial products he offered.

On cross-examination, Ottaviano was a difficult witness. He claimed that a tax case against his business partner had been dismissed, which prompted the District Court to interrupt the prosecutor's line of questioning. The Court argued with Ottaviano about how the case had actually been resolved until the prosecutor offered into evidence a certified copy of the judgment. Soon thereafter, prosecutors impeached Ottaviano on false representations he had made about having a college degree and law degree. After prosecutors introduced evidence that Ottaviano had withdrawn from an online law school in 2006, the District Court also questioned him about his fake Villanova diploma, before the prosecutor had a chance to do so. This prompted the Assistant U.S. Attorney to state: "Your Honor, you anticipated my next question."

9

After prosecutors concluded their questioning, which had laid bare Ottaviano's scheme, the Court followed up with leading questions of its own about how Ottaviano's phony educational credentials would have helped him sell his financial products. After a brief cross-examination by counsel for a co-defendant, Ottaviano's standby counsel conducted a redirect, during which the Court again began asking skeptical questions, this time about BIC and other people's obligations to pay their mortgages. The Court also asked Ottaviano to characterize other witnesses' testimony, questioned why Ottaviano had not produced witnesses who had said BIC worked, and opined: "But when I asked you did it work, candidly you've answered no."

Standby counsel then tried to rehabilitate Ottaviano by asking him to explain why he had claimed to have a law degree. He started to answer when the District Court intervened again:

> THE COURT: Whoa, whoa, whoa. Did you ever hear of earning a—earning credits so that you could apply, having achieved grades and gone to school and get marks, and then apply to law school? Did you ever hear that?
>
> OTTAVIANO: Oh, sure.
>
> THE COURT: Did you ever realize there are people that do that—
>
> OTTAVIANO: Yes.
>
> THE COURT: —and they work hard—
>
> OTTAVIANO: Yes.

THE COURT: —and then they apply to law school?

OTTAVIANO: Yes.

\* \* \*

THE COURT: Let me ask you this: Did you ever think that it was okay to earn money based on a similar premise you're articulating?

OTTAVIANO: No, I wouldn't think so.

THE COURT: Wouldn't think so? . . . But it's okay to give law school [*sic*] your false transcript and to get a degree based on something that was fraudulent or false? That's okay?

This line of questioning continued until Ottaviano's standby counsel surrendered by remarking: "I have nothing further, Judge." All told, Ottaviano's testimony covered 140 pages of a trial transcript that spanned 3,300 pages.

After Ottaviano stepped down, the District Court offered a cautionary instruction explaining that the Court had a right to ask questions of a witness, "particularly if there's ambiguity in the Court's opinion, if I think there's an area that would assist us in all understanding something better, if I believe that there's an area that could be elaborated on more to get to the truthfulness of what it is." The judge told the jury they should not give his questions more weight than anyone else's.

Afterward, other witnesses testified, and the Court adjourned for the day. Neither Ottaviano nor his standby counsel offered any objection to the Court's questioning at any point that day, although there were two separate breaks that offered an opportunity to do so outside the presence of the jury. Ottaviano did, however, move for a mistrial first thing the next morning on the grounds that he had been "unduly prejudiced in front of the jury":

> OTTAVIANO: When I stipulated to the fake diploma, I did that based on the fact that I lied and I wanted to lessen the impact of it, and when I was cross-examined by your Honor and hammered on that issue—

> THE COURT: I didn't, Mr. Ottaviano. The transcript will speak for itself. Don't characterize it as hammering. I have a right to ask you questions, particularly, and I'll tell you why in a minute. But let me hear your position.

Ottaviano then stated that he would not have testified had he known he would face such cross-examination on his false educational credentials. He insisted further that the District Court's cross-examination "basically told the jury that I defrauded the law school, which means the jury believes whatever the judge says . . . [so] they're going to take the fact that I defrauded my clients and the government as well."

The Government responded that Ottaviano had opened the door to cross-examination about the fake diploma and that the limiting instruction cured any potential prejudice stemming from the Court's questions. Judge Martini then

12

explained his actions, saying that he was "a little befuddled by [Ottaviano's] cavalier attitude that it was okay to [claim false educational credentials]." "Quite frankly, I thought it was appropriate to ask questions as to why you thought this was okay," Judge Martini said. "To the extent that [the jury] heard it from me, they would have heard it from the Government, probably, in the same way." He then denied the motion for a mistrial, saying that the record would speak for itself and that there was no prejudice.

The jury deliberated about four and a half hours before finding Ottaviano guilty on all counts. On December 16, 2011, the District Court sentenced Ottaviano to 62 months in prison. Because the Government took longer than expected to compile restitution information and because Ottaviano had not fully disclosed his assets, the final restitution order was delayed. On January 8, 2013, the District Court ordered Ottaviano to pay $1,520,553.70 in restitution.[2] This timely appeal followed.

## II

Ottaviano raises four issues on appeal, only one of which is worthy of extensive analysis. In that claim, Ottaviano argues that the District Court denied him a fair trial in violation of his Fifth Amendment right to due process of law when it cross-examined him.[3]

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[3] Ottaviano's brief also takes issue with the Court's questioning of defense witnesses as well, but counsel

13

A

As a threshold matter, we must determine the correct standard of review. Federal Rule of Evidence 614(c) provides that "[a] party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present." Here, Ottaviano did not strictly comply with that rule because he did not object during the questioning or at the next opportunity when the jury was not present, or the next opportunity after that. Consequently, the Government urges us to review this claim for plain error.

Although this is a close call, Ottaviano's pro se status, combined with the fact that he moved for a mistrial at the outset of the next day's business, counsel in favor of holding that he preserved that issue for appeal. *See United States v. Evans*, 994 F.2d 317, 323 (7th Cir. 1993) (Rule 614 objection preserved for appeal when defense counsel made a motion for mistrial as the first order of business the following day); *see also Tabron v. Grace*, 6 F.3d 147, 153–54 n.2 (3d Cir. 1993) ("[W]e have traditionally given *pro se* litigants greater leeway where they have not followed the technical rules of pleading and procedure."). Accordingly, we shall review the denial of his motion for a mistrial for abuse of discretion, focusing on whether any conduct at trial was so prejudicial that the defendant was deprived of a fundamental right—in this case, the right to a fair trial. *See United States v. Xavier*, 2 F.3d

acknowledged at oral argument that that issue is not before us on appeal. Oral Argument Recording at 34:25.

14

1281, 1285 (3d Cir. 1993); *United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1983).

B

Federal Rule of Evidence 614(b) allows judges to question witnesses and act as more than "a mere moderator." *Quercia v. United States*, 289 U.S. 466, 469 (1933). But a judge must not "abandon his [or her] proper role and assume that of an advocate." *United States v. Adedoyin*, 369 F.3d 337, 342 (3d Cir. 2004) (quoting *United States v. Green*, 544 F.2d 138, 147 (3d Cir. 1976)). "[I]solated questioning to clarify ambiguities is one thing," but "a trial judge cannot . . . take over the cross-examination for the government to merely emphasize the government's proof or question the credibility of the defendant and his witnesses." *Beaty*, 722 F.2d at 1095 (quotation omitted). "The judge's participation must never reach the point where 'it appears clear to the jury that the court believes the accused is guilty.'" *Id.* at 1093 (quoting *United States v. Nobel*, 696 F.2d 231, 237 (3d Cir. 1982)).

Judges must be especially careful about their conduct during trial because they hold a position of special authority and credibility in the eyes of the jury. Thus, "cross-examination of a witness by the trial judge is potentially more impeaching than such an examination conducted by an adversary attorney" and can prove fatal to a witness's credibility, particularly if that witness is the defendant. *United States v. Godwin*, 272 F.3d 659, 678 (4th Cir. 2001). "Even when the evidence provides the court with a negative impression of the defendant," as was the case here, "the judge must refrain from interjecting that perception into the trial." *Id. See Beaty*, 722 F.2d at 1094 (observing that "a jury might

15

think that a witness would be more likely to tell the truth to the judge than to counsel").

In *Beaty*, we found error in the judge's "overzealous" and "lengthy cross-examination" of a key defense witness, which spanned four pages in the trial transcript. 722 F.2d at 1096. We noted that judges should minimize their own questioning during trial, "to the end that any such judicial departure from the normal course of trial be merely helpful in clarifying testimony rather than prejudicial in tending to impose upon the jury what the judge seems to think about the evidence." *Id*. at 1095 (internal quotation marks omitted); *see also United States v. Wilensky*, 757 F.2d 594, 597–98 (3d Cir. 1985) (holding that trial judge's interruptions and extensive examination during both direct and cross-examination of a key defense witness "overstep[ped] the bounds of prudent judicial conduct").

In this case, the District Court erred in questioning Ottaviano. It skeptically questioned him at length during his direct examination and, after the Government completed its thorough cross-examination, "follow[ed] up" on prosecutors' questions about Ottaviano's fake educational credentials with a barrage of its own. On redirect, the Court repeatedly interrupted again, challenging Ottaviano about his assertions and his witnesses' testimony. Then, at the end of redirect, the judge renewed his indignation about Ottaviano's false educational credentials, prodding him for approximately five pages of the trial transcript and inviting him to speculate on the ultimate issue in the case.

The Government attempts to downplay the District Court's incursions. While it is easy to see how Ottaviano's testimony would have tested even the most patient jurist, that

is no excuse for a judge to "abandon his . . . proper role and assume that of an advocate." *Adedoyin*, 369 F.3d at 342 (internal quotation marks omitted).

Although some of Ottaviano's testimony was confusing, both his standby counsel and the prosecutors were capable of clarifying it without the Court's intervention. Moreover, in both tone and content, the worst of the District Court's questions went beyond mere clarification to become cross-examination. In the transcript, the Court appears highly dubious of Ottaviano's defense. As justifiable as that sentiment was, however, it should not have been conveyed to the jury. Because the District Court violated this imperative, we hold that its questioning of Ottaviano was improper.

C

Having found error, we turn to the question of remedy. As Ottaviano's able counsel acknowledged at oral argument, improper judicial questioning is not structural error, the very existence of which renders a trial fundamentally unfair. *See United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (noting that "only . . . certain structural errors undermining the fairness of a criminal proceeding as a whole . . . require[] reversal without regard to the mistake's effect on the proceeding."). Thus, the verdict must stand if the error did not deprive Ottaviano of a fair trial. *Beaty*, 722 F.2d at 1092; *see Lutwak v. United States*, 344 U.S. 604, 619 (1953) ("A defendant is entitled to a fair trial but not a perfect one."). "[N]o absolute, rigid rule exists" in making this determination. *Beaty*, 722 F.2d at 1093. Rather, "a balancing process must be employed to determine whether the trial judge's comments have pervaded the overall fairness of the proceeding." *Wilensky*, 757 F.2d at 598. We must examine

the trial record as a whole to determine whether the error prejudiced the defendant. *Id*. An error is harmless if it is "highly probable that the error did not contribute to the judgment." *United States v. Vosburgh*, 602 F.3d 512, 540 (3d Cir. 2010) (quoting *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999)).

Some of the factors we have considered in determining whether to reverse for improper judicial questioning include: the portion of the trial record affected, whether the jury was present, whether the judge appeared to treat both sides evenhandedly, whether curative instructions were provided, the extent to which the judge betrayed bias or cast doubt on the witness's credibility, and other evidence of the defendant's guilt. *Wilensky*, 757 F.2d at 598; *Beaty*, 722 F.2d at 1093–94, 1097.

The few Third Circuit cases on this subject are not clearly analogous to Ottaviano's case. In *Beaty*, for example, we reversed one defendant's conviction but upheld another following claims of improper judicial questioning of witnesses. 722 F.3d at 1092–97. The Government presented extensive evidence in a two-week trial against Beaty, the defendant whose conviction was affirmed, and we held that the judge's "few . . . intemperate remarks" during the cross-examination of a prosecution witness were insufficient to prejudice the defendant given the "length of the trial and the overwhelming evidence of [the defendant's] guilt." *Id*. at 1095.

In the same decision, however, we reversed the conviction of Beaty's codefendant after the judge peppered his key witness with questions "completely unrelated to the offenses with which [defendant] was charged, the alibi which

[defendant] offered, and the substance of [the witness's] testimony." *Id*. at 1095. This was of crucial importance because the Government had little other evidence against the defendant and even admitted in its closing argument that if jurors believed the witness, the defendant's conviction could not be sustained. *Id*. at 1095–96. In this context, we found the judge's questioning sufficiently prejudicial to warrant reversal. *Id*. at 1096. *See also Wilensky*, 757 F.2d at 597–98 (affirming defendant's conviction under harmless error analysis following judge's extensive interjections during key witness's testimony, finding that although judge's actions were error, they did not prejudice the defendant in light of the "overwhelming testimony which clearly supported the jury's verdicts of guilty").

*United States v. Godwin*, a Fourth Circuit case in which two defendants were convicted in connection with a pyramid scheme, is more analogous to Ottaviano's case. 272 F.3d at 663. There, the Government presented thirty-two witnesses to prove the defendants perpetrated a fraud scheme. *Id*. at 666. As in Ottaviano's case, the defendants did not directly challenge the essentials of the scheme, but instead claimed they had no fraudulent intent and "focused their defense efforts on an attempt to prove good faith." *Id*. Each defendant testified and denied they intended to defraud investors. *Id*. On appeal, one defendant claimed that the judge cross-examined her at length, interrupting both direct and cross-examination. *Id*. at 674.

The Fourth Circuit noted that although the judge's questions and interruptions early in the trial were infrequent and permissible, her extensive questioning during the defense's case was "skeptic[al]," "overly involved," "troublesome," and seemingly "on, or tending to be on, the

side of the Government." *Id.* at 675, 679, 681. It nevertheless declined to overturn the verdict "[b]ecause of the compelling and overwhelming evidence presented against [defendants]," especially because they had not contested the essential facts of the case and, like Ottaviano, "failed to produce any corroborating evidence of good faith." *Id.* at 680. The panel concluded that "[w]here the evidence is overwhelming and a perfect trial would reach the same result, a substantial right is not affected." *Id.*

In Ottaviano's case, the prosecution presented overwhelming documentary and testimonial evidence of guilt, including damning recordings of him that jurors heard well before Ottaviano testified. Ottaviano produced no explanation for why Mid-Atlantic's server was hidden in the crawl space and no witnesses or other evidence to prove that BIC worked. Indeed, his witnesses did him no favors. One testified that the IRS was not part of the federal government, while another claimed to be domiciled in heaven for tax purposes. Once Ottaviano testified, near the end of a three-and-a-half-week trial, things did not improve. Ottaviano's uninterrupted explanation of BIC on direct examination was confusing at best, and he freely discussed his reasons for believing he was not subject to the federal income tax. The Government then conducted a devastating cross-examination, during which Ottaviano responded argumentatively to questions such as: "If you had sent a letter to [then-Treasury Secretary Henry] Paulson asking him whether it was okay for you to pass counterfeit 20-dollar bills and he didn't respond within your 30-day deadline, would that silence be acquiescence?" In response to a prosecutor's question, Ottaviano also said that one could buy the New York Mets and Yankees five times over and use BIC to discharge the debt. All this preceded the

20

most inappropriate judicial questioning, which occurred during redirect.

We also emphasize that the trial transcript in this case is roughly 3,300 pages long, and Ottaviano's testimony is a mere fraction of it: about 140 pages. Although Ottaviano's testimony was not immaterial, the outcome almost certainly did not turn on it, given the amount of other evidence and witnesses involved. The rare cases where appellate courts have ordered new trials because of improper judicial questioning generally have had far less evidence of guilt, resulting in a greater likelihood that the judge's questioning affected the outcome. For instance, in *United States v. Mazzilli*, the Government lacked direct evidence of the defendant's guilt, which was not the case here. 848 F.2d 384, 388 (2d Cir. 1988). *See also Beaty*, 722 F.2d at 1096 ("Because the evidence of Ballouz's guilt . . . was far from overwhelming we cannot conclude that this error did not prejudice Ballouz.").

Ottaviano is correct that the Court's curative instruction did little to blunt the impact of its aggressive questioning. *See Beaty*, 722 F.2d at 1096 (holding that "the damaging impression created by the judge's questions" was not mitigated by subsequent instructions, and that "such admonitions may offset [only] brief or minor departures from strict judicial impartiality"). But that is just one factor we must consider. Viewing the trial in its totality, we hold that there was such overwhelming evidence of Ottaviano's guilt that the Court's improper questioning was immaterial to the jury's verdict.

## III

Ottaviano also argues that the District Court violated his Sixth Amendment right to represent himself when it ordered him to leave the courtroom during the discussion about his letter to the Treasury Secretary.

The Sixth Amendment guarantees a criminal defendant the right to proceed pro se, just as it guarantees the right to counsel. *Faretta v. California*, 422 U.S. 806, 820–21 (1975). In determining whether a defendant's right to represent himself has been respected, "the primary focus must be on whether the defendant had a fair chance to present his own case in his own way." *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984). The core of this right is the defendant's ability "to preserve actual control over the case he chooses to present to the jury." *Id.* at 178. But appearances also matter: "[P]articipation by standby counsel . . . should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* A defendant's right to represent himself is structural and not amenable to harmless error analysis—it is either respected or denied. *United States v. Peppers*, 302 F.3d 120, 127 (3d Cir. 2002) (citing *McKaskle*, 465 U.S. at 177 n.8). Thus, we exercise plenary review over this claim. *Id.*

In this case, Ottaviano's brief absence from the courtroom affected neither his ability to represent himself nor the jury's perception that he was doing so. The Court made no substantive decisions while Ottaviano was out of the courtroom, and he invited Ottaviano to return and questioned him directly before admitting the letter, as Ottaviano requested. Most importantly, the jury was not present during any of the events about which Ottaviano complains.

22

Exclusion from a single sidebar conference conducted outside the jury's presence does not automatically deny one the right to self-representation; rather, it must be viewed in the context of the trial as a whole. *See United States v. Mills*, 895 F.2d 897, 904–05 (2d Cir. 1990). Here, Ottaviano participated in the full range of trial activities by delivering an opening statement, conducting direct and redirect examinations of his own witnesses, cross-examining the Government's witnesses, making objections, and giving a closing argument. Ottaviano also addressed the District Court at every conference that occurred while the jury was present. Viewed in the context of the trial, Ottaviano's Sixth Amendment right to represent himself was not infringed.

Nor did Ottaviano's exclusion from the courtroom deny him the right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). We review this claim—which derives from the Fifth and Sixth Amendments, as articulated in Fed. R. Crim. P. 43—for harmless error. *United States v. Toliver*, 330 F.3d 607, 613 (3d Cir. 2003). Ottaviano fails to point to anything that would have happened differently had he been present at the conference, or to any legitimate reason why a "fair and just hearing [was] thwarted by his absence." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (internal quotation marks omitted). Consequently, Ottaviano's exclusion was likely not erroneous. And even if it was, it was harmless error insofar as the District Court admitted the evidence that gave rise to the dispute. [4]

---

[4] Ottaviano also raises two other issues on appeal, neither of which is persuasive. First, the District Court did not

IV

In sum, the Government presented overwhelming evidence of Ottaviano's guilt at a lengthy trial, the great majority of which was conducted fairly and properly. Viewing the record as a whole, we cannot say that Ottaviano received an unconstitutional trial. Accordingly, we will affirm his judgment of conviction.

---

constructively amend the indictment in its charge to the jury such that the Government was excused from having to prove that PTOs and BIC were illegal. *See Vosburgh*, 602 F.3d at 531–32. Ottaviano was clearly convicted of the same offenses charged in the indictment. Second, Ottaviano's argument that the District Court's delay in ordering restitution divested it of the authority to order restitution at all is foreclosed by the Supreme Court's decision in *Dolan v. United States*. 130 S. Ct. 2533 (2010). *Dolan* held that the federal restitution statute, 18 U.S.C. § 3664(d)(5), does not divest the District Court of the authority to order restitution in situations such as this one, where the sentencing court made clear prior to the deadline's expiration that it would order restitution and the defendant did not ask the court to grant a timely hearing within the 90-day window. *Id*. at 2537, 2539–42.