**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 13-1836
———————

UNITED STATES OF AMERICA

v.

JOHN BENCIVENGO,
                                   Appellant

———————————————

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.:  3-12-cr-00429-001)
District Court Judge:  Honorable Anne E. Thompson

———————————————

Argued on March 6, 2014

(Opinion filed: April 23, 2014)

Before: RENDELL, SMITH and HARDIMAN,
Circuit Judges

Jerome A. Ballarotto, Esquire  **(Argued)**
143 Whitehorse Avenue
Trenton, NJ   08610

*Counsel for Appellant*


Mark E. Coyne, Esquire
Steven G. Sanders, Esquire  **(Argued)**
United States Attorney
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ   071020

*Counsel for Appellee*

O P I N I O N

**RENDELL**, Circuit Judge:

Appellant John Bencivengo, former Mayor of Hamilton Township, New Jersey, was convicted of violating, *inter alia*, the Hobbs Act, 18 U.S.C. § 1951(a) and § 2, and the Travel Act, 18 U.S.C. § 1952(a)(1) and (3) and § 2, for accepting money from Marliese Ljuba in exchange for agreeing to influence members of the Hamilton Township School Board to refrain from putting the School District's insurance contract up for competitive bidding.   For the

reasons set forth below, we will affirm the judgment of the District Court.

## I. Background

Bencivengo was elected Mayor of Hamilton Township, New Jersey in 2007. Prior to his election, Bencivengo served on the Hamilton Township School Board and was a prominent Hamilton Township politician, serving as Chairman of the local Republican Party. Bencivengo was reelected as Mayor in 2011.

Bencivengo was close friends with Marliese Ljuba, whom he had known since 2004.[1] Ms. Ljuba was the insurance broker for the Hamilton Township School District. She personally earned between $600,000 and $700,000 in commissions from insurance contracts with the School District in 2011 alone. In 2011, the School District's insurance contracts were up for renewal. One School Board member, Stephanie Pratico, urged the School Board to place the contract up for competitive bidding, rather than to simply renew the existing contract held by Ms. Ljuba's firm.

In March of 2011, Bencivengo, who was facing financial difficulties, asked the Township's Director of Community Planning and Compliance, Robert Warney, to approach Ms. Ljuba about providing him some financial assistance. In May 2011, the two met, and ultimately Ms.

---

[1] These facts are largely gleaned from the trial testimony of Ms. Ljuba and from the FBI's recorded conversations between Bencivengo and Ms. Ljuba. They are substantially uncontroverted by Mr. Bencivengo, who did not testify at trial.

Ljuba agreed to provide Bencivengo with $5,000. There was some discussion of the money taking the form of a loan; however, Ms. Ljuba suggested that, instead, Bencivengo convince Ms. Pratico not to put the School Board's insurance contract up for bid. Ms. Ljuba believed that Bencivengo could influence Ms. Pratico because "[t]he [M]ayor is the head of the [R]epublican party in Hamilton Township. He has a lot of political influence over anyone in a lower position in the township government." (Supp. App. 103.) Bencivengo agreed to help Ms. Ljuba with Ms. Pratico. Worried about raising alarms at the bank with large cash withdrawals, Ms. Ljuba asked Bencivengo if she could write him a check instead of giving him cash. Bencivengo did not want a check made out to him, so they agreed that Ms. Ljuba's husband would write a check to Mr. Warney's wife, and put in the memo line that the check was for a "cherry bedroom set."

On June 29, 2011, Bencivengo approached Ms. Ljuba again, asking for her assistance in helping him pay his property taxes. By this time, Ms. Ljuba was cooperating with the FBI and was recording her conversations with Bencivengo. Ms. Ljuba again agreed to assist him, stating, "You help me with Pratico, you got anything because you know I am gonna need that down the road." (Supp. App. 979.) Ms. Ljuba meant that Bencivengo would "talk to [Ms. Pratico] and influence her not to direct the school district to go out to bid for the brokerage contract." (Supp. App. 138.) Bencivengo responded that he was "helping you as much as I can." (Supp. App. 138.)

On July 11, 2011, Ms. Ljuba and Bencivengo had lunch in Hamilton. Ms. Ljuba told Bencivengo that she

4

wanted to select the next person to fill a vacant seat on the School Board, and had a particular woman in mind—the sister of an insurance company representative who was a political unknown in Hamilton Township. Bencivengo told Ms. Ljuba that he would approve the woman. Ms. Ljuba testified that she needed his approval because, "in Hamilton it is practice that if you want a position on the school district and you're a [R]epublican you would go to the [M]ayor and ask for his approval." (Supp. App. 142.) The two also discussed Ms. Ljuba's planned payment to Bencivengo. The two agreed that the money would be exchanged during their upcoming trip to Atlantic City, because they could make it seem as though Bencivengo had won the money gambling.

On July 28, 2011, Bencivengo met Ms. Ljuba in her hotel room in Atlantic City, and she gave him $5,000 in $100 bills. Bencivengo informed Ms. Ljuba that he had already talked to Ms. Pratico, and had urged Ms. Pratico that "you have to support those who support you," reminding her that he had backed her when she wanted to run for School Board. (Supp. App. 159.) Bencivengo also stated, "I'm gonna give [Pratico] a call and see if I can get rid of her off the school board, which would be huge, and get her in the [State] Assembly . . . ." (Supp. App. 1005.) Bencivengo meant that he intended to encourage Ms. Pratico to run for a seat in the State Assembly. (Bencivengo Br. 17.)

It is undisputed that, as Mayor, Bencivengo had no statutory power or authority over the School Board. He had no vote on the Board, nor any official role in choosing members of the School Board.

Bencivengo was charged with two counts of violating the Hobbs Act and two counts of violating the Travel Act, as

5

premised on the New Jersey bribery statute, N.J.S.A. 2C:27-2.[2] On October 12, 2012, approximately one month before trial began, the Government submitted its proposed jury instructions. With respect to the Hobbs Act counts, the instructions stated, in relevant part, as follows:

> Extortion under color of official right means that a public official induced, obtained, accepted, or agreed to accept a payment to which he was not entitled, knowing that the payment accepted or to be accepted was made in return for taking, withholding or *influencing* official acts. . . . The Government is not required to prove that the public official actually possessed the official power to guarantee, deny, or influence any official actions. It is enough to show that [Ljuba] reasonably believed that the public official had the actual, residual, or anticipated official power to help [Ljuba] with respect to matters pending before a government agency.

> \*     \*     \*

---

[2] Bencivengo was also charged with money laundering in violation of 18 U.S.C § 1956(a)(1)(B)(i) and § 2, but has not appealed his conviction on that charge.

> A public official commits extortion if he intentionally obtains, accepts, or agrees to accept money or other valuable benefit to which he was not entitled, knowing that the payment was made in return for taking, withholding, or influencing official action. Official action means any action by an official relating to their employment or function as a public servant, *to include using one's influence* with other government officials, or expediting treatment of the payor's business with government.

Government's Proposed Jury Instructions, Case 3:12-cr-00429-AET (Doc. 20-1, at 19-22) (hereinafter, Gov. Proposed Jury Instructions) (emphasis added). Bencivengo did not object to the Government's proposed instructions; nor did he file his own proposed jury instructions.

At the close of the Government's case, Bencivengo's counsel moved for judgment of acquittal under Fed. R. Crim. P. 29, on the ground that "the United States has failed to provide sufficient evidence that a reasonable jury can conclude that Mr. Bencivengo accepted this money in exchange for an exercise of his official duties as Mayor of Hamilton Township." (Supp. App. 483.) The Government

7

opposed the motion, arguing that "[i]t is enough to show that the payor reasonably believed that the public official had the actual, residual or anticipated official power to help the payor with respect to matters pending before a government agency." (Supp. App. 484-85.) The District Court denied Bencivengo's motion, stating that:

> The fact that [Bencivengo] was the Mayor of Hamilton Township and not the school board president or chairman does not matter. The astounding testimony that has been presented in this case of how the . . . interconnectedness between the officials of the township, the members of the school board, the schemes to place persons from office in Hamilton Township into the New Jersey State Assembly, all pointing to this *pervasive influence and power actively exercised*, it is surely a jury question as to whether the payments in this case were made to affect official conduct of the defendant.

(Supp. App. 487-88) (emphasis added).

At the close of evidence, the District Court instructed the jury in accordance with the proposed jury instructions filed by the Government. (Supp. App. 637-39.) On

8

November 20, 2012, the jury returned a verdict of guilty on each count of the Indictment.

On appeal, Bencivengo argues that the District Court erred by failing to grant his motion for judgment of acquittal. With respect to his conviction under the Hobbs Act, he urges that the Government failed to identify any official act that was involved. He argues that, as Mayor, he had no official authority over actions of the School Board, and therefore, had no actual power to replace Ms. Pratico or to otherwise ensure that Ms. Ljuba retained the insurance contract with the School District. Bencivengo challenges his conviction under the Travel Act for similar reasons. He states that, in agreeing to exercise his influence over members of the School Board, he was not "performing a governmental function," as required by the New Jersey bribery statute that served as the predicate for his Travel Act conviction.

In addition, Bencivengo urges that his convictions under the Hobbs Act and Travel Act require proof of the same elements, and that, therefore, his conviction on both counts violates the Double Jeopardy Clause of the Fifth Amendment. Finally, he argues that the District Judge's interruptions and criticism of defense counsel during the trial unduly prejudiced the jury against him, requiring reversal.

## II. Discussion

### A. Hobbs Act

#### 1. Motion for Judgment of Acquittal

We exercise plenary review over Bencivengo's claim that the District Court erred in failing to grant his motion for judgment of acquittal on the Hobbs Act counts and apply the same standard as the District Court. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Accordingly, we "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *Id.* (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)).

The Hobbs Act makes it a crime to "obstruct . . . delay. . . or affect . . . commerce or the movement of any article or commodity in commerce, by robbery or extortion." "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. §§ 1951(a), (b)(2). The Government urged that Bencivengo acted "under color of official right." On appeal, Bencivengo argues that his position as Mayor of Hamilton Township gave him no official power over the School Board and he should, therefore, have been acquitted, as he did not act "under color of official right." Similarly, he argues that Ms. Ljuba, a savvy operator well-versed in Hamilton Township politics, could not have reasonably believed he had the power to cause the School Board to decide against putting its insurance contract up for competitive bidding. Accordingly, he argues, the Government has failed to establish that he acted "under color of official right."

The Government contends that Bencivengo's argument is foreclosed by our opinion in *United States v. Mazzei*, 521

10

F.2d 639 (3d Cir. 1975) (en banc), *cert. denied*, 423 U.S. 1014 (1975).  In that case, defendant Mazzei, a Pennsylvania state senator, used his influence to arrange for two state agencies to rent office space owned by property rental company BMI.  As a legislator, Mazzei had no actual power over the leasing of rental property by state agencies.  Mazzei informed a representative of BMI that "it was the practice on all state leases that a ten percent of the gross amount of the rentals would be paid to a senate finance re-election committee."  *Id.* at 641.  BMI paid the money to Mazzei in cash.

On appeal, Mazzei argued that the payments made to him did not violate the Hobbs Act, as they merely represented BMI's "voluntary purchase of his influence in an area in which he never pretended to have any official power."  *Id.* at 643.  We rejected this argument, holding that, "in order to find that defendant acted 'under color of official right,' the jury need not have concluded that he had actual *de jure* power to secure grant of the lease as long as it found that *[BMI] held*, and *defendant exploited*, a *reasonable belief* that the state system so operated that the *power in fact of defendant's office included the effective authority* to determine recipients of the state leases here involved."  *Id.* (emphasis added).  We stated that the government had presented "sufficient evidence to justify a finding by the jury that [BMI] *could reasonably have believed* that as a concomitant of his official position defendant *possessed not mere influence over state leases but in fact had effective power* to determine to whom these leases were awarded even though his office gave him no such de jure power."  *Id.* at 644 (emphasis added).

11

Bencivengo argues that *Mazzei* is not controlling because our holding in that case turned on the issue of BMI's reasonable belief that Mazzei had "effective power" to determine the outcome of the decision, and "not mere influence." *Id*. He urges that, in the instant case, the Government does not contend that Ms. Ljuba believed Bencivengo to have "effective power" over the School Board's decision regarding whether to put the insurance contract up for bid—indeed, Ms. Ljuba testified to that effect. Instead, the Government rests its case on Ms. Ljuba's purchase of, and belief in, Bencivengo's influence over the members of the School Board by virtue of his position as Mayor.[3]

While we find some merit in Bencivengo's argument that our holding in *Mazzei* did not include situations where the victim of the extortion, here Ms. Ljuba, believed that the public official had only influence, and not "effective power" over the decision, that does not foreclose us from extending its reach. We have not previously had occasion to determine whether the power to influence by virtue of one's office

---

[3] *See, e.g.*, Gov. Br. 23 ("Here, the evidence allowed a rational jury to find that Bencivengo accepted payments from Ljuba in exchange for promising to use his influence as mayor to intervene with school board members . . . ."); *id*. at 30 ("Here, there was ample evidence from which a rational jury could infer that Ljuba reasonably believed that Bencivengo had the authority to perform his end of the corrupt bargain, *i.e.*, influencing school board members."); *id*. at 31 ("what matters was the reasonable belief in Bencivengo's official *influence* over school board members") (emphasis in original).

satisfies the "under color of official right" requirement. However, other courts of appeals have explicitly held that the mere agreement to exercise influence is sufficient to sustain a conviction for extortion under the Hobbs Act. For example, in *United States v. Loftus*, 992 F.2d 793 (8th Cir. 1993), a county commissioner was convicted of Hobbs Act extortion for accepting a bribe in exchange for agreeing to influence the city council's decision to rezone a property for a shopping center development. Though he was an official of the county, and not the city, Loftus told an undercover FBI informant that obtaining the votes for rezoning "would simply be a matter of swapping intergovernmental favors." *Id*. at 795. On appeal, Loftus argued that he did not accept the money "under color of official right" because he lacked official authority over the zoning process, and because there was no evidence that the development's sponsors believed that he could cause the property to be rezoned. *Id*. at 796. The Court of Appeals upheld Loftus's conviction, stating that, "[a]ctual authority over the end result—rezoning—is not controlling if Loftus, through his official position, had influence and authority over a means to that end." *See also United States v. D'Amico*, 496 F.3d 95, 102 (1st Cir. 2007) ("A reasonable jury thus could have concluded that D'Amico explicitly promised . . . that, in exchange for the $2,500 payment, he would use his influence as a city councilor to pressure the traffic department to pursue the road-widening project. This conclusion is sufficient to ground a conviction."); *United States v. Bibby*, 752 F.2d 1116, 1128 (6th Cir. 1985); c*f. United States v. Blackwood*, 768 F.2d 131, 135-36 (7th Cir. 1985) (sustaining a Hobbs Act conviction where "a jury could have found that Agent Ries reasonably believed that appellant had the power, through his official position and the connections and contacts it gave him

13

. . . , to influence the judicial decisions in the cases for which appellant received bribes.").[4]

We agree with the reasoning of our sister courts of appeals. There is no doubt that Bencivengo had no actual *de jure* or *de facto* power over the award of School Board insurance contracts; nor is there evidence that Ms. Ljuba believed he had such power. However, the record is sufficient for a reasonable jury to find that Bencivengo's position as Mayor of Hamilton Township gave him *influence* over members of the School Board, and that Ms. Ljuba believed that he had such influence. Accordingly, to the extent our decision in *Mazzei* does not reach the particular facts of this case, we now hold that where a public official has, and agrees to wield, influence over a governmental decision in exchange for financial gain, or where the official's position could permit such influence, and the victim of an extortion scheme reasonably *believes* that the public official wields such influence, that is sufficient to sustain a conviction under the Hobbs Act, regardless of whether the official holds any *de jure* or *de facto* power over the decision. Accordingly,

---

[4] Other circuits have held similarly in the context of other federal bribery statutes. *See, e.g., United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) (conspiracy to travel in interstate commerce to defraud the United States in violation of 18 U.S.C.S. § 371) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision."); *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) (illegal gratuity statute, 18 U.S.C. § 201 *et seq.*).

we reject Bencivengo's argument that his lack of actual or "effective power" over the School Board is fatal to his conviction under the Hobbs Act. Similarly, it is enough that Ljuba believed that Bencivengo's position gave him influence, and not "effective power," over the School Board's decision with regard to the insurance contract.[5]

## 2. Jury Instructions

Bencivengo's argument is also foreclosed on another ground. Specifically, he failed to object to the Government's proposed jury instructions, which were filed well before trial commenced, and which were replete with statements indicating that a public official's agreement to exercise influence over a governmental decision (or the victim's reasonable belief in the official's ability to exercise such influence) is sufficient to find a violation of the Hobbs Act. Bencivengo did not object to the proposed instructions at the time they were filed by the Government; nor did he object to

---

[5] Bencivengo argues that the coercion element of Hobbs Act extortion cannot be satisfied where the purported victim of the extortion scheme (here, Ms. Ljuba) was not threatened or coerced in any way. This argument is foreclosed by settled precedent. *See United States v. Manzo*, 636 F.3d 56, 65 (3d Cir. 2011) ("In essence, when proceeding under a 'color of official right' theory, the 'misuse of a public office is said to supply the element of coercion.'"); *Mazzei*, 521 F.2d at 644 (in a Hobbs Act prosecution based on an action under color of official right, "any element of coercion that may be required to establish extortion under the Hobbs Act is supplied by the misuse of the defendant's official power.").

15

them at the time they were read to the jury in a form substantially identical to what the Government had proposed.

Where a party fails to object to jury instructions, we review whether the instructions stated the correct legal standard for plain error. *United States v. Elonis*, 730 F.3d 321, 327 n.2 (3d Cir. 2013). While, as noted above, we may not have confronted the precise situation presented in this case, other circuits have consistently held that an agreement by a public official to exercise influence over a governmental decision, or the victim's reasonable belief in the official's ability to exercise such influence, is sufficient to support a conviction under the Hobbs Act. Indeed, the Government cited several of these cases in support of its proposed jury instructions. *See* Gov. Proposed Jury Instructions, at 21 n.15 (citing, *inter alia*, *Loftus* and *Bibby*). As described *supra*, we believe the reasoning of these cases is sound, and indeed Bencivengo has failed to point to any contrary precedent. Accordingly, we cannot say that the District Court committed plain error in accepting the Government's unopposed proposed jury instructions. Moreover, when considered for sufficiency of the evidence, the record clearly supports the jury's conviction on the instructions that were given to it.

## B. Travel Act

Bencivengo also claims that the District Court erred by denying his motion for judgment of acquittal on the Travel Act charges because he was not "performing a governmental function" when accepting money from Ms. Ljuba in exchange for his agreement to exert his influence over the School Board. We apply plenary review. *Brodie*, 403 F.3d at 133.

16

A Travel Act violation occurs when an individual "travels in interstate . . . commerce or uses the mail or any facility in interstate . . . commerce, with intent to (1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity . . . ." 18 U.S.C. § 1952(a)(1), (3). The Travel Act includes as an "unlawful activity", "(2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States . . . ." Here, the Government bases its Travel Act charge on Bencivengo's interstate telephone calls with Ms. Ljuba and his causing Ms. Ljuba to travel from her home in Delaware to New Jersey to violate the New Jersey Bribery in Official and Political Matters offense, which provides, in relevant part:

> A person is guilty of bribery if he . . . solicits, accepts or agrees to accept from another:
>
> a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or
>
> . . .
>
> c. Any benefit as consideration for a violation of an official duty

17

of a public servant or party official . . . .

It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, or lacked jurisdiction, or for any other reason.

N.J. Stat. Ann. § 2C:27-2. The statute defines a "public servant" as "any officer or employee of government, including legislators and judges, and any person participating as juror, advisor, consultant or otherwise, in performing a governmental function . . . ." N.J. Stat. Ann. § 2C:27-1(g).

Bencivengo's claim that he cannot be convicted under the statute because he was not "performing a governmental function" in putting pressure on School Board members essentially amounts to a rehashing of his argument that he did not have any actual power over the award of School Board insurance contracts.[6] The argument is even less compelling

---

[6] The Government argues that the phrase "performing a governmental function" modifies the phrase "any person participating as a juror, advisor, consultant, or otherwise," and does not limit the activities of "public servant[s]" or "officer[s] or employee[s] of government." *See* Gov. Br. 41. The Government is likely correct, and in any case, it is clear that Bencivengo was attempting to influence a "governmental function."

here, where the state statute makes clear that the lack of actual jurisdiction over the decision is no defense to the crime. *See, e.g.*, *State v. Schenkolewski*, 693 A.2d 1173 (N.J. Super. Ct. App. Div. 1997) ("[I]t is sufficient if the recipient created the understanding with the briber that he could influence matters in connection with an official duty, whether or not he was capable of actually effecting such an action."); *State v. Sherwin*, 317 A.2d 414, 422 (N.J. Super. Ct. App. Div. 1974) (affirming conviction under predecessor bribery statute where Secretary of State had accepted a bribe from a contractor in return for urging the Secretary of Transportation to reject the lowest bid on a road project and to reopen bidding).[7]  Accordingly, we reject Bencivengo's claim that his Travel Act conviction must be reversed because he was not "performing a governmental function" when accepting bribes from Ms. Ljuba.

---

[7] Bencivengo relies on *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976), where we reversed a Travel Act conviction based on the predecessor to the current New Jersey bribery statute, on the ground that the government had failed to show that the defendant had any actual or apparent influence over any official decisions regarding a commercial development project, or that the alleged bribers believed he had such influence.  In *Dansker*, unlike in the present case, it was unclear from the record whether the developers were even aware that the defendant held an official position.  *Id*. at 49-50.  Here on the other hand, it is clear that Ms. Ljuba at least believed that Bencivengo had influence over the School Board, and there is no question that she knew Bencivengo was the Mayor.  Accordingly, Bencivengo's reliance on *Dansker* is misplaced.

## C. Double Jeopardy

Bencivengo argues that his convictions for Hobbs Act extortion and Travel Act bribery are multiplicitous because they were based on essentially the same conduct on his part, and therefore violate the Double Jeopardy Clause of the Fifth Amendment. Because Bencivengo did not object on this basis in the proceedings below, we review for plain error. *United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 2006).

"Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299 (1932). The Government correctly points out that the Travel Act requires the Government to prove that the defendant traveled (or caused someone to travel) in interstate commerce, or used the mail or any facility in interstate commerce, whereas a Hobbs Act violation occurs if the defendant "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." The Hobbs Act does not require proof of interstate travel or the use of the mail or any other interstate facility, while the Travel Act does not require proof of extortion that affects interstate commerce. Rather, by its terms, the Travel Act would theoretically apply if an individual travelled across state lines in order to commit a purely intrastate act of extortion or bribery.[8]

---

[8] It is true that some courts have found that a defendant's act of crossing state lines to commit a crime is relevant to the

Indeed, several courts of appeals, including our own, have upheld convictions under both the Hobbs Act and Travel Act based on the same conduct. *See, e.g.*, *United States v. Somers*, 496 F.2d 723 (3d Cir. 1974); *United States v. Bornscheuer*, 563 F.3d 1228 (11th Cir. 2009); *United States v. Millet*, 123 F.3d 268 (5th Cir. 1997); *United States v. Shields*, 999 F.2d 1090 (7th Cir. 1993); *United States v. Hollis*, 725 F.2d 377 (6th Cir. 1984); *United States v. Walsh*, 700 F.2d 846 (2d Cir. 1983); *United States v. Billups*, 692 F.2d 320 (4th Cir. 1982); *United States v. Hathaway*, 534 F.2d 386, 397 (1st Cir. 1976). And we are unaware of any cases in which a court has found that a defendant may not be prosecuted under both the Hobbs Act and Travel Act for the same conduct. Accordingly, it cannot be said that the District Court's failure to *sua sponte* raise and sustain a Double Jeopardy challenge to Bencivengo's convictions under the Hobbs Act and Travel Act was plain error.

## D. Conduct of the Trial Judge

Bencivengo maintains that the District Court denied him a fair trial by interrupting defense counsel's cross-

---

Hobbs Act jurisdictional analysis. However, these courts have typically been careful to note that such interstate travel does not, *by itself*, suffice to establish jurisdiction under the Hobbs Act, which still requires a *de minimis* effect on interstate commerce. *See, e.g.*, *United States v. Le*, 256 F.3d 1229, 1237 (11th Cir. 2001); *United States v. Kaplan*, 171 F.3d 1351, 1356 (11th Cir. 1999).

examination of Ms. Ljuba, chastising him in the presence of the jury, and criticizing him for asking questions that, according to the District Judge, were compound or otherwise unclear. We employ the plain error standard with respect to Bencivengo's arguments regarding the conduct of the District Judge, as no objection was lodged at trial. *United States v. Nobel*, 696 F.2d 231, 237 (3d Cir. 1982).

The Supreme Court has described the high bar a litigant must meet to demonstrate that the conduct of the trial judge has prejudiced the trial against him. In *Liteky v. United States*, 510 U.S. 540, 555-56 (1994), the Court stated that:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as

federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

However high the bar, the judge may not assume an advocacy role or make it "'clear to the jury that the court believes the accused is guilty.'" *United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1985) (quoting *Nobel*, 696 F.2d 237); *see also United States v. Wilensky*, 757 F.2d 594, 598 (3d Cir. 1985) ("By assuming the roles of judge, attorney, and witness in the same proceeding the trial judge abandons the impartiality with which he is charged."). *See, e.g.*, *Reserve Mining Co. v. Lord*, 529 F.2d 181 (8th Cir. 1976) (reversing where the trial judge conducted extensive examination of witnesses, commented on evidence and on the credibility of defense witnesses, and criticized the ability of plaintiff's counsel); *Lyle v. Renico*, 470 F.3d 1177, 1180-81 (6th Cir. 2006); *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972).

Examining the record as a whole, we cannot say that the District Judge's actions were improper. The District Judge did not conduct any examination of defense counsel or cross-examine any defense witnesses. Nor did the District Judge lead Ms. Ljuba or express an opinion on any evidence presented by the defense. The most that can be said is that the District Judge admonished defense counsel on several occasions to clarify questions that perhaps did not need to be clarified, as they were clearly understood by Ms. Ljuba. *See United States v. Hynes*, 467 F.3d 951 (6th Cir. 2006) (no reversible error where the district judge, among other things,

"interrupted defense counsel to ask him to clarify his questions, to avoid an argumentative tone with a witness, [and] to proceed to a different topic because the one in question had been exhausted . . . ."). In addition, the District Judge twice reminded the jury that it was not to draw any inference from her comments as to whether the Court held any opinion as to Bencivengo's guilt. (Supp. App. 615-16, 629.) *See United States v. Ottaviano*, 738 F.3d 586, 596 (3d Cir. 2013) (noting the relevance of curative instructions in determining whether the court's remarks prejudiced the defendant); *United States v. Price*, 13 F.3d 711, 723-24 (3d Cir. 1994) (finding no reversible error where "there [was] no suggestion . . . that the judge inappropriately participated in the questioning of witnesses" and where "the judge charged the jury that they were not to rely on their perception of his beliefs."). We conclude that the District Judge's conduct did not constitute reversible error.[9]

### III. Conclusion

For the reasons stated above, we will affirm the judgment of the District Court in all respects.

---

[9] Moreover, even if a trial judge's conduct is improper, it may still constitute harmless error where the evidence adduced at trial is so overwhelming that the trial judge's behavior was immaterial to the jury's conclusion. *See Ottaviano*, 738 F.3d at 597-98; *Wilensky*, 757 F.2d at 598 (noting that the judge's conduct was harmless when considered in light of the "overwhelming testimony" presented by the government). Here, the evidence of guilt was overwhelming, and indeed Bencivengo does not even dispute the key facts underlying his convictions.