NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2193-08T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL ROSS II,

    Defendant-Appellant.

_____

Submitted February 8, 2012 – Decided December 28, 2012
Remanded by Supreme Court July 3, 2014
Resubmitted October 15, 2014 – Decided March 8, 2016

Before Judges Messano, Ostrer and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 06-10-1640.

Joseph E. Krakora, Public Defender, attorney for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant Michael Ross II was convicted of the first-degree murders of Alesky Bautin and Sergey Barbashov, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree

possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1). The judge sentenced defendant on the murder counts to two consecutive life terms, each subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a consecutive five-year term on the hindering charge.

We reversed defendant's convictions, finding the trial judge erred in substituting a juror after the jury had announced it was deadlocked. State v. Ross, No. A-2193-08 (App. Div. Dec. 28, 2012) (Ross I). The Supreme Court reversed and remanded for us to consider defendant's remaining points on appeal. State v. Ross, 218 N.J. 130, 155 (2014).

Those contentions are:

> POINT II[1]
>
> THE DEFENDANT'S RIGHT TO A FAIR TRIAL BY JURY WAS VIOLATED BY THE TRIAL COURT'S EXCESSIVE AND PREJUDICIAL INTERVENTION IN THE TRIAL, NECESSITATING REVERSAL. U.S. CONST., AMENDS. VI, XIV; N.J. CONST. (1947), ART. 1, PAR 9. (Not Raised Below).

> POINT III

---

[1] Defendant's first point on appeal pertained to the juror substitution issue.

THE DEFENDANT WAS PREJUDICED BY MISLEADING TESTIMONY CONCERNING THE POLYGRAPH EXAMINATION OF A KEY STATE'S WITNESS, AND THE TRIAL COURT REFUSED TO ADEQUATELY REMEDY THE HARM. U.S. CONST., AMENDS. VI, XIV; N.J. CONST. (1947), ART. 1, PAR 10.

POINT IV

THE STATE COMMITTED PREJUDICIAL MISCONDUCT BY FORCING DEFENDANT TO CHARACTERIZE STATE'S WITNESSES AS HAVING "MADE UP" THEIR HIGHLY INCRIMINATORY TESTIMONY. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. 1, PAR 10. (Not Raised Below).

POINT V

THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

A.   The Aggregate Sentence Is Excessive.

B.   The Consecutive Sentence for Hindering Is Improper.

In a pro se supplemental brief, defendant raises the following points:

POINT ONE

THE STATE'S WITNESS INVESTIGATOR CLEMENTS' TESTIMONY BEFORE THE JURY, THAT HE KNEW THE STATEMENT OF ANOTHER STATE'S WITNESS GREG WAKEFIELD GIV[EN] TO THE POLICE TO BE TRUTHFUL CONSTITUTED A PROHIBITED ASSESSMENT OF WAKEFIELD'S CREDIBILITY WHICH DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL[.]   THEREFORE, THE DEFENDANT'S CONVICTION SHOULD BE REVERSED.

POINT TWO

A-2193-08T4

THE NUMEROUS INFLAMMATORY AUTOPSY AND CRIME SCENE PHOTOS OF THE VICTIMS REPEATEDLY SHOWN TO THE JURY, AND THE PLAYING OF THE 911 PHONE CALL TO THE JURY OF ONE OF THE VICTIM'S MOANING HIS LAST BREATHS DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL[.] THEREFORE THE CONVICTION SHOULD BE REVERSED.

We have considered these arguments in light of the record and applicable legal standards. We affirm the convictions but remand the matter for resentencing.

                                    I.

We reviewed at length the underlying facts of the case in our prior opinion. See Ross I, supra, slip op. at 3-12. It suffices to say that the State contended defendant shot and killed the victims after mistaking them for Mitchell "Mitch" Wright, someone who had threatened defendant with a gun nearly one month earlier on October 1, 2003. On October 1, defendant, in an attempt to avoid the confrontation, backed his car into another. He left the scene after parking his damaged vehicle nearby and without notifying police. On October 2, defendant voluntarily came to police headquarters and gave a statement regarding the incident. Without providing any name, defendant told police that the gun-waving assailant drove a burgundy or maroon Ford Taurus or Mercury Sable that he had seen many times before in the neighborhood.

4                                          A-2193-08T4

The State established that Mitch lived at the nearby Forest View apartment complex in Woodbridge Township and owned a red 1988 Volkswagen Jetta. Late on the night of October 30, 2003, both victims were killed while seated in the front seat of a red, 1999 Volkswagen Passat parked outside Building 12 of the apartment complex. The murders remained unsolved for years.

The State relied upon a veritable rogue's gallery of witnesses to prove its case. The only eyewitness to the homicides who testified was Jamil McKnight. McKnight admitted that he was with defendant during the October 1, 2003 gun-waving incident, and that defendant identified Mitch as the person with the gun.

McKnight, who did not drive because of a condition that seriously impaired his vision, testified that on October 30, he, defendant, Sherrill Williams and Ron Huff were driving around the neighborhood in McKnight's car when defendant said he spotted the individuals who had threatened him weeks earlier sitting in a parked car near the apartment complex. Defendant insisted on returning to McKnight's house to retrieve a handgun McKnight was holding for defendant. At that point, Huff left the vehicle and Williams remained at McKnight's home.

McKnight accompanied defendant as he drove back to the apartment complex past the car, made a u-turn and slowed down as he approached it again. Defendant fired multiple shots through

the passenger side window into the car from a distance of approximately three to four feet. McKnight claimed he and defendant discarded the gun before visiting a mutual friend, Greg Wakefield. McKnight admitted retrieving the gun before dawn on October 31, taking it to work with him in New York City, and with Williams present, giving the gun to a man in Queens he knew only as Dante.

Huff testified and corroborated much of McKnight's testimony. He was not present during the October 1 incident, however, on the night of the murders, he was driving with defendant, McKnight and Williams when he heard defendant repeatedly mention a "red Jetta," and "the same people from Rahway Avenue," the site of the October 1 incident. Huff heard defendant ask McKnight, "you still got that at your house," and, after McKnight answered affirmatively, defendant said, "[l]et's go get it." At that point, Huff grew concerned and asked to be let out of the car. Shortly thereafter, as he walked alone in the neighborhood near the apartment complex, he heard what he thought were firecrackers and then police sirens. Huff saw a car with its passenger window blown out. On approaching it, he saw that the passenger was apparently dead but the driver was still alive and badly injured. Huff told the man help was on the way.

The State also called Sharhi Roberts and Wakefield as witnesses. Roberts was defendant's girlfriend in October 2003 and testified that on October 31, the day after the shootings, defendant told her that he shot people at the Forest View apartment complex. About one year later, she brought up the shootings in conversation, and defendant again admitted to being the shooter and explained that at the time of the shooting, he believed the car he shot into was Mitch's car. Although not mentioned in her prior statements to police, Roberts testified that during a subsequent argument with defendant, she threatened to tell police about the shooting. Defendant then told her that he made up the story.

Wakefield was a reluctant witness, and the State ultimately introduced his prior statements to police as substantive evidence pursuant to State v. Gross, 216 N.J. Super. 98 (App. Div.), certif. denied, 108 N.J. 194 (1987). Wakefield acknowledged that defendant and McKnight visited his house on the night of the shooting. He claimed an inability to recall details of any conversation with defendant, but the prosecutor confronted Wakefield with a prior sworn statement in which Wakefield said that defendant appeared "jumpy" and said that he was "popping off at Forest View," which Wakefield took to mean shooting. Wakefield also told investigators that defendant

owned a 9 mm. gun and had intended to shoot Mitch, but shot the two victims by mistake.

Before the jury, Wakefield repeatedly disavowed his prior statements to police. He asserted that police questioned him at length, subjected him to a polygraph and continued until "they got the one they wanted to hear." He characterized the interrogation session as "torture." Wakefield confirmed that he was present on October 1 during the gun waiving incident and observed that the man with the gun was driving a red Taurus. Wakefield knew Mitch drove an old Jetta, not a Taurus.

The defense suggested that McKnight alone, or with the assistance of Williams, who did not testify, shot the victims. Each of the above four witnesses was subjected to vigorous cross-examination that focused on inconsistencies between their respective accounts of events, inconsistencies between the multiple statements each had provided to police, the aggressive investigative techniques employed by police and the motives each witness had to lie.

Roberts acknowledged that investigators harassed her and her family. After she provided police with a statement, a disorderly persons charge against Roberts for making false public alarms was dismissed. Wakefield gave two statements in April 2005, when he was facing criminal charges of terroristic threats, resisting arrest and unlawful possession of a weapon.

As part of his plea agreement, Wakefield agreed to give truthful testimony on behalf of the State against defendant. However, by the time of trial, Wakefield had served his sentence and completed his parole. The implication was that Wakefield was now free to tell the truth.

McKnight avoided prosecution for his role in the homicides completely. He was charged with obstruction but permitted to enter the Pre-trial Intervention Program (PTI). Although Huff faced no charges during the relevant timeframe, defendant demonstrated that when initially questioned by police, Huff did not tell them about his car ride with defendant and the others, nor did he tell them about the statements defendant made in the car. Huff only provided those details when questioned years later.

Defendant also asserted alibi through his testimony and that of another witness. After acknowledging that he had been convicted in 2006 of a fourth-degree crime for which he was sentenced to eighteen months' incarceration without parole,[2] defendant described the October 1 incident. He denied that Mitch was involved and described the gun-waving assailant as exiting a Taurus or Sable, as he told police on October 2, 2003.

---

[2] Defendant was convicted of fourth-degree aggravated assault with a firearm. The nature of the conviction was sanitized by the court. See State v. Brunson, 132 N.J. 377, 387-88 (1993).

Defendant acknowledged knowing that Mitch drove a 1988 red Jetta.

Defendant testified that on the night of the murders, he was driving with McKnight, Williams and Huff when they saw a Taurus leaving the Forest View complex. McKnight suddenly asked to return home. When they arrived there, Huff left and McKnight entered his house, returning to the car with something wrapped in a bandana. Defendant believed it was a gun. Defendant drove to the house of a friend, LaToya McPhatter. Leaving McKnight and Williams in the car, defendant stayed at McPhatter's house briefly and then walked to Wakefield's house, where McKnight arrived later. Defendant denied shooting the victims.

However, defendant's credibility was severely damaged on cross-examination. It was revealed that a telephone conversation defendant had with his father while incarcerated in in 2006 after being arrested for the homicides was recorded without defendant's knowledge. Defendant told his father that he was not in Middlesex County at all on the night of the murders. He also told his father that Mitch was, in fact, involved in the October 1, 2003 incident.

Defendant also called LaToya McPhatter's younger sister in support of his alibi. However, the young girl, only thirteen years of age in 2003, testified that she thought she saw defendant on the night of the killings but could not recall

speaking with him. On cross-examination, the prosecutor confronted her with a statement in which she told investigators that she did not recall defendant visiting that night at all.

After summations and instructions from the judge, the jury began its deliberations. On the fifth day, the jury indicated it was unable to reach a unanimous verdict. Ross, supra, 218 N.J. at 136. After the judge provided the instructions approved in State v. Czachor, 82 N.J. 392, 404-06 (1980), a juror became ill. Ibid. After dismissing that juror the following day, the judge substituted an alternate juror and instructed the jury to begin deliberations anew. Ibid. The jury deliberated for more than sixteen hours over the course of four additional days before returning its guilty verdicts. Ibid.

II.

Defendant argues that the trial judge "engaged in an impermissible amount of questioning of witnesses," which "in its aggregate [was] highly prejudicial." We acknowledge that the judge's questions far exceeded what was necessary to clarify testimony, were in most instances gratuitous and added little to the presentation of evidence. We do not condone the judge's conduct.

However, we disagree with defendant and our dissenting colleague that the judge's questions, none of which raised an objection from defense counsel, were "clearly capable of

11                                        A-2193-08T4

producing an unjust result." R. 2:10-2. The judge's conduct, while a mistaken exercise of discretion, does not "'raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]'" State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

A.

We begin by recognizing that a trial judge, "in accordance with law and subject to the right of a party to make timely objection, . . . may interrogate any witness." N.J.R.E. 614. The Rule is intended to promote the trial court's duty to insure a fair trial. Taffaro, supra, 195 N.J. at 445, 450. A judge may question a witness if necessary to protect the proceedings or the rights of any party, clarify testimony, avoid unnecessary delay or elicit material facts. State v. O'Brien, 200 N.J. 520, 534-35 (2009); Taffaro, supra, 195 N.J. at 445; State v. Guido, 40 N.J. 191, 207 (1963); State v. Medina, 349 N.J. Super. 108, 131 (App. Div.), certif. denied, 174 N.J. 193 (2002).

However, the judge "is an imposing figure," symbolic of "experience, wisdom, and impartiality." Guido, supra, 40 N.J. at 208. His or her ability to pose questions to witnesses during a jury trial, therefore, must be exercised with "great restraint . . . in order not to influence the jury." Taffaro, supra, 195 N.J. at 451. The judge must "not telegraph to the

jury any partiality to a given party's side." O'Brien, supra, 200 N.J. at 534 (citing Taffaro, supra, 195 N.J. at 451). A judge may not "take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant and his witnesses." Id. at 535 (quoting United States v. Bland, 697 F.2d 262, 265 (8th Cir. 1983)).

We must consider the entire record when deciding whether a defendant was denied a fair trial as a result of the judge's intervention. State v. Martinez, 387 N.J. Super. 129, 138 (App. Div.), certif. denied, 188 N.J. 579 (2006). An appellate court may assess "[t]he overall length of the questioning[,] . . . [b]ut it is the impact of the court's questions, and not the number of minutes they lasted, which matters most." Taffaro, supra, 195 N.J. at 453-54.

With these standards in mind, we review the nature and extent of the judge's intervention, particularly regarding those instances that defendant claims require reversal.

B.

The judge posed questions to almost every witness called by the State. The first two witnesses, police officers Vincent Totka and Michael Ng, investigated the October 1, 2003 incident. While questioning Ng, the judge asked how police became aware of defendant's possible involvement, a fact that the prosecutor had

not developed on direct. The answers revealed that police found identifying documents in the damaged car, which engine was still warm. Police contacted defendant's father who accompanied defendant to police headquarters on October 2, at which time defendant voluntarily provided a statement about the previous night's events. Defendant argues the judge's questions served to paint him as a lawless individual who failed to report his involvement in a traffic accident.

The judge also posed limited questions to the industry witness who authenticated the subscriber information for an incoming 911 call made on the night of the murders by Barbashov, the State police lieutenant who answered the call, Bautin's brother, who heard the fatal shots from a nearby apartment he shared with the decedent, and Barbashov's former girlfriend.

Christopher Lyons was the first officer to respond to the scene of the murders. The judge asked some limited questions about the conditions of the lighting at the time, and what Lyons did to secure the scene. Lyons also testified about his efforts after being assigned to investigate the case in late 2004. Defendant points to some questions the judge asked regarding Lyons' investigation of a "cold" case, and how law enforcement never considers a cold case to be closed. Defendant contends these questions served to justify, in the jurors' minds, the

aggressive interrogation of the critical State's witnesses that followed during the ensuing years leading to defendant's arrest.

The judge extensively questioned the State's ballistics expert, two medical examiners who performed the autopsies and the investigator who processed the crime scene. We agree that the questions did little to clarify the testimony of these witnesses and, in many respects, seemingly served only to display the judge's personal knowledge of the subject matters involved. Defendant contends that the sheer amount of questioning lent credence to the State's theory of the case.

As to the four witnesses whose testimony we referenced above, however, it is fair to say that the judge's questioning was quite limited. The judge asked Huff about the lighting conditions at the murder scene, something Lyons testified to, and what Huff and the others were drinking on the night of the murders. Defendant argues the judge supplied Huff, who knew McKnight by his street name, "Sagacious," with McKnight's true name, but that issue was broached during cross-examination.

Defendant posits no specific objection to the judge's questioning of McKnight because no questions were asked. Nor did the judge pose questions to Wakefield. However, the judge intervened during the testimony of Investigator Mark Clements, who took sworn statements from Wakefield and was the State's

predicate witness to establish admissibility of those statements pursuant to Gross.[3]

Clements denied that Wakefield was harassed, but acknowledged that the investigators were aggressive because of Wakefield's reluctance to cooperate. The judge interrupted defendant's cross-examination of Clements as it related to how much time Wakefield was in police custody before providing a formal statement, and how much time Wakefield spent with the polygraphist before providing the statement. At sidebar, the judge indicated that Clements, who was not present during the polygraph, could not possibly know about the procedures employed by the polygraphist that night.

The prosecutor followed up on that theme during redirect and established that Clements did not know how long a polygraphist would spend explaining the test or administering preliminary questions before beginning the actual examination. Following redirect and brief recross, the judge asked if the polygraph examination was administered in a separate room and

---

[3] Prior inconsistent statements made by a witness may be offered by the proponent of that witness only after a hearing at which the judge is required to consider a number of factors. Gross, supra, 216 N.J. Super. at 109-10. The judge conducted a hearing outside the presence of the jury pursuant to N.J.R.E. 104. Clements subsequently testified before the jury regarding the circumstances under which Wakefield was questioned.

established that Clements and Lyons were not present during the administration of the test.

As our dissenting colleague notes, the judge's decision to sua sponte call for a sidebar during cross-examination of Clements was improper, and it served to disrupt development of the timeline of Wakefield's questioning. However, the point of defendant's line of questioning was on full display for the jury, i.e., Wakefield was in police custody for an extensive period of time, despite Clements' assertion that he was not, and any inculpatory information Wakefield provided differed significantly from what he initially told police, and its disclosure only followed aggressive, repeated interrogation.

Defendant points to a testy exchange that occurred during Roberts's testimony. Only days before the trial, Roberts told defense counsel's investigator that defendant told her he fabricated his involvement in the murders. During direct examination, the prosecutor asked why Roberts had not divulged that information in any of her statements to officers investigating the crime. Roberts responded that she was harassed by investigators and was telling them what they wanted to hear.

Defense counsel asked Roberts to "describe for the jury the manner in which [the investigators] harassed you with as much specificity as you can." Roberts provided a rambling answer, in

which she claimed to have been evicted as a result of investigators constantly questioning her and other family members. She reiterated that she had tried to tell investigators that defendant told her he fabricated his earlier confession, but they did not want to hear that information.

At a sidebar discussion that followed the prosecutor's objection, the judge asked defense counsel how the eviction claim was relevant. The judge directed counsel to carefully structure his questions to elicit the chronology of the investigator's alleged conduct. After the sidebar, the judge gave the following directions to Roberts:

> JUDGE: All right. Now, Miss Roberts, you have to listen to the questions of [defense counsel] very carefully. All right?
>
> WITNESS: Okay.
>
> JUDGE: You listen to the question and you think and you only answer his question.
>
> WITNESS: Okay.
>
> JUDGE: Try to focus on his question and then try to give a specific answer to that question. Right? Could you do that?
>
> WITNESS: Yes.
>
> JUDGE: I appreciate it. Thank you very much.

It suffices to say, however, that the judge grew impatient with Roberts's continued failure to provide direct answers regarding the circumstances of her eviction.

A-2193-08T4

Defendant argues that the judge's impatience telegraphed his doubt regarding Roberts's claims of harassment by investigators. However, our review of the record reveals that the judge repeatedly overruled the prosecutor's objection to this line of inquiry in an attempt to permit its full development.

C.

Defendant relies extensively upon Taffaro and O'Brien, although he concedes that the judge's questioning here "was not as unabashedly partisan . . . ." Indeed, in both Taffaro and O'Brien, the Court concluded that the judicial questioning was partisan and effectively tilted the evidence in the State's favor, thereby denying the defendants a fair trial.

In Taffaro, supra, 195 N.J. at 448, the judge posed a relatively extensive amount of questions to the defendant. The questions "did not help clarify [the] defendant's under-standable testimony; instead, they underscored the weaknesses in his defense." Id. at 452. The Court summarized:

> [T]he questions had the effect of suggesting to the jury that the court doubted defendant's account in a case that rested heavily on defendant's credibility. The questions also covered, in part, terrain that had already been crossed. Rather than clarify points in a witness's testimony, the court's questions had the capacity to signal disbelief.
>
> [Id. at 453.]

In O'Brien, supra, 200 N.J. at 525, the defendant asserted a diminished capacity defense to charges that he murdered his parents. The Court cited the questions posed by the judge to the defendant and the judge's extensive questioning of the defense psychiatrist. Id. at 526-27. The Court also cited the judicial questioning of one of the State's investigators, which it characterized as "effectively hammer[ing] nails into defense counsel's ongoing cross-examination and bolster[ing] the State's witness." Id. at 539. The Court summarized the prejudicial effect of the judge's questioning this way:

> [T]he defense was made up of three prongs: defendant's own testimony about his drug- and depression-induced condition on the night of the murder and at the time of the confession; his expert's testimony regarding the effects of defendant's condition; and the neutralization of witnesses who saw defendant and opined that he was not under the influence of drugs. The judge intervened on each of those prongs, by expressing disbelief when defendant and his expert testified, and by helping to counter defendant's challenge to Investigator Mitchell.
>
> [Ibid.]

In Guido, supra, 40 N.J. at 208 n.2, a case cited by defendant and the Court in Taffaro and O'Brien, among other things, the judge's salacious questioning of the defendant had the clear capacity to discredit her testimony before the jury and resulted in reversal. In State v. Ray, 43 N.J. 19, 27

(1964), cited by the Court in Taffaro, the judge conducted "lengthy questioning of [the] defendant's key witness," a defense pathologist. The judge also engaged in "frequent interrogation of [the] defendant [that] improperly suggested his doubts as to her credibility." Id. at 28.

Defendant has failed to bring to our attention any published opinion in which our courts have reversed a defendant's conviction based upon judicial questioning directed solely to the State's witnesses.[4] This is not to say that a judge's improper questioning of the State's witnesses may compel reversal if, for example, it serves to bolster the State's case. The harm exceeds the impact of any actual answer provided by the witness because it conveys that the judge is taking "one party's side." Taffaro, supra, 195 N.J. at 451. Our point is simply that when the judge's conduct is directed toward a defendant and his witnesses, it carries a greater risk of not only conveying

---

[4] In three of the federal cases cited by our dissenting colleague, the questioning of the defendant or defense witnesses figured prominently or exclusively in compelling reversal. See United States v. Ottaviano, 738 F.3d 586, 596 (3d Cir. 2013); United States v. Filani, 74 F.3d 378, 381 (2d Cir. 1996); Bland, supra, 697 F.2d at 264-65. In United States v. Rivera-Rodriguez, 761 F.3d 105, 111, 113 (1st Cir. 2014), cert. denied, ___ U.S. ___, 136 S. Ct. 1573, 191 L. Ed. 2d 656 (2015), the offending questions were posed to the government's two cooperating witnesses.

impartiality to the jury but also negatively impacting the fair presentation of a defense. O'Brien, supra, 200 N.J. at 534-35.

In this case, defendant concedes that the judge did not pose questions to him or his alibi witness at all. He argues, nonetheless, that this lack of questioning, when compared to the extensive questioning of the State's witnesses, subtly discredited the defense case. This argument might have merit, except that, as we already noted, the judge posed few questions to the four witnesses whose testimony mattered most in resolving the single contested issue in the case, i.e., the identity of the shooter.

The judge asked few questions of Huff. The testimony of McKnight, the only eyewitness, was unfettered by any questions from the judge. The same is true of Wakefield, who, in the end, recanted any testimony that was damaging to defendant. Although we cannot divine the impact of Wakefield's testimony on the jury, it is difficult to imagine that the jury found any of it, including his prior statements, to be credible. As to Roberts, the judge expressed a level of frustration with her testimony, but, on balance, defense counsel was able to fully impeach her credibility regarding defendant's alleged admissions and also obtained the benefit of Roberts's late-asserted claim that defendant had recanted any prior admissions.

In this case, therefore, we must part company with our dissenting colleague and conclude that the impact of the extensive and, in many instances, unnecessary questioning by the judge does not "raise a reasonable doubt" that "the jury [was led] to a result it otherwise might not have reached[.]" Taffaro, supra, 195 N.J. at 454. We add some additional reasons that support our conclusion.

We have recognized that "[c]laims of judicial misconduct pose a severe problem to our appellate tribunals for 'it is difficult to review a charge of unfairness upon a dry record.'" Medina, supra, 349 N.J. Super. at 131 (quoting Guido, supra, 40 N.J. at 208). In this case, however, defense counsel, who was "in the trenches" and best able to assess what, if any, impact the judge's questioning was having, never posed a single objection. We should not assume counsel was shy or reluctant for fear of alienating the judge because, as we noted, the judge repeatedly overruled the prosecutor's objections during defense counsel's cross-examination of Roberts. Defense counsel's decision not to object was quite rational, given that most of the judge's questions were posed to witnesses that provided

scant evidence of defendant's involvement in the murders and had little impact on the defense strategy.[5]

Moreover, we cannot overemphasize the powerful effect that the cross-examination of defendant must have had upon the jury. After testifying that he was at McPhatter's house when the shootings occurred, the State confronted defendant with his own words to the contrary. At the time, defendant was not speaking to a cellmate or some jailhouse "snitch." He was speaking with his father, the man who accompanied him to police headquarters to report the gun-waving incident of October 1, 2003.

Lastly, the jury in this case deliberated extensively before indicating it was deadlocked. After a juror was excused for illness, the reconstituted jury deliberated for many hours over several more days. We acknowledge, without necessarily accepting, the proposition that these lengthy deliberations reflect that the State's evidence was not overwhelming, and that in such a close case, there was fertile ground upon which the judge's extensive questioning might sow mischief.

However, the last witness called by the State, and the last witness to whom the judge posed any questions, testified on April 10, 2008. The last witness — defendant — testified on

---

[5] We further note that defendant's motion for a new trial decided immediately before sentencing did not challenge the nature or scope of the judge's questioning of witnesses.

April 15, and the jury began its deliberations the next day. The verdict was announced on April 29, 2008, nearly three weeks after the judge interjected his last question. In our minds, the jury's extensive deliberations indicate the judge's questioning weeks earlier had little impact upon the fair consideration of the evidence.

In sum, we find no basis to reverse defendant's conviction on this ground.

III.

Defendant's remaining points warrant limited comment. We find no error, let alone plain error, in the judge's refusal to disclose to the jury the results of Wakefield's polygraph — that he was not forthright — which preceded his first formal statement. Our Court has consistently held that polygraph results are generally inadmissible because they are unreliable. State v. A.O., 198 N.J. 69, 86 (2009). Polygraph evidence may also "receive undue weight and distract jurors from judging the credibility of witnesses directly." Id. at 92. Moreover, the record does not reflect what questions Wakefield allegedly answered with a lack of candor. Consequently, the instruction that defense counsel requested — informing the jury that Wakefield had essentially failed the test — would only have invited speculation.

Nor are we convinced by defendant's argument that the jury would likely have concluded that Wakefield was truthful to the polygraphist, because the police subsequently took his statement. The jury could have just as plausibly concluded that Wakefield dissembled to the polygraphist, and only upon being confronted with that result, decided to change his story, without any assurance that the next version was any more truthful than the previous one. Furthermore, as the defense established, Wakefield gave yet another statement a few weeks later, which deviated significantly from the first.

Under these circumstances, the judge appropriately instructed the jury not to speculate as to the results of the polygraph; and to consider the fact that Wakefield submitted to a polygraph only in connection with how long he was interrogated by Clements and Lyons. We presume the jury was capable of following these instructions.[6] Ross, supra, 218 N.J. at 152.

As for defendant's claim of prosecutorial misconduct, it is inappropriate for the State to ask a witness to opine whether another witness was truthful. State v. Bunch, 180 N.J. 534, 549 (2004). Defense counsel could have objected when the prosecutor asked defendant whether Wakefield and Roberts had lied. But no

---

[6] We note that Roberts also testified that she submitted to a "lie detector" during questioning. However, defense counsel did not seek any instruction regarding that polygraph.

objection was raised. Consequently, in reviewing the issue, we must determine if there was plain error. We conclude there was none, given that it was a principal defense theme that Wakefield and Roberts had in fact lied.

In a similar vein, in his pro se filing, defendant argues that an answer given by Clements during cross-examination, in which the detective expressed his personal belief that Wakefield's second statement as "truthful," requires reversal. This answer was not appropriate, but defense counsel never sought to strike the testimony, and, in light of our earlier comments regarding Wakefield's credibility, this single answer did not amount to plain error.

Also in his pro se filing, defendant contends the admission of autopsy and crime scene photos, as well as the playing of the Barbashov's 911 call to police, requires reversal. There were repeated objections to the photographs, primarily because defendant did not contest the cause and manner of death, or, for that matter, any evidence from the crime scene. The judge overruled these objections, tersely explaining that the prosecutor had the right to prove her case. It is clear from the record, however, that the judge limited the number of photos that the prosecutor otherwise wished to publish to the jurors.

We ordinarily review the trial court's evidentiary rulings to determine whether there was a mistaken exercise of

discretion. State v. J.D., 211 N.J. 344, 354 (2012). Any decision to admit or exclude crime scene photographs rests with the sound discretion of the trial judge. State v. Johnson, 120 N.J. 263, 297 (1990). We apply the same standard to the admission of autopsy photographs. State v. Morton, 155 N.J. 383, 455-56 (1998). Here, copies of the admitted photographs are not included in the record, and we have no basis upon which to conclude the judge's highly discretionary decision requires reversal.

As to the recording of the 911 call, there was no objection during the testimony from Barbashov's girlfriend, who identified his voice on the tape. However, when the State rested, the judge noted defense counsel's objection to its admission. We acknowledge that the tape of the victim calling 911 after having been shot and as he neared death lacked any significant probative value and probably should not have been admitted. However, we cannot conclude that this brief snippet of a phone conversation denied defendant a fair trial.

IV.

Defendant was almost twenty-one years old at the time of the homicides and nearly twenty-six years old at sentencing in August 2008. The judge noted defendant's prior adjudications of delinquency, as well as two adult convictions that took place after the murders. As noted above, defendant's prior conviction

for aggravated assault involved the pointing of a firearm; a second adult conviction was for theft.

Citing State v. Yarbough, 100 N.J. 627, 643-44 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986), State v. Carey, 168 N.J. 413 (2001), and State v. Molina, 168 N.J. 436 (2001), the judge concluded that consecutive sentences were appropriate because there were "two victims." The judge reviewed the tragic circumstances of the victims' deaths and much of defendant's biographical information before concluding that aggravating sentencing factors three, six and nine applied. N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); -1(a)(6) (the extent of prior criminal record and the seriousness of the offense for which defendant was convicted); and -1(a)(9) (the need to deter defendant and others). Although the prosecutor urged application of other aggravating factors, the judge rejected them without explanation, and he also rejected defense counsel's argument that mitigating factor eleven applied. See N.J.S.A. 2C:44-1(b)(11) (imprisonment would entail an excessive hardship to defendant's family).

Concluding the aggravating factors "substantially outweigh[ed]" the non-existent mitigating factors, the judge stated that defendant "must be separated from normal society for the rest of his natural life." The judge imposed two consecutive life terms, both subject to NERA. The judge gave no

explanation at all for the consecutive sentence imposed on the hindering apprehension charge, which was premised on defendant's concealment of the murder weapon.

Defendant essentially concedes that pursuant to Yarbough, Carey and Molina, "consecutive terms of imprisonment are virtually mandated in a case involving multiple homicides." However, he contends the judge failed to consider the "real-time consequences of NERA," although he acknowledges that the judge's stated intention to "separate[] [defendant] from normal society for the rest of his natural life," reflects a complete, albeit inappropriate, understanding that defendant must now serve 127.5 years before he is eligible for parole. Defendant argues the aggregate sentence is excessive. He also contends that the judge gave no explanation for imposing a consecutive five-year term on the hindering charge.

We begin by noting that "[a]ppellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has recently reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

30                                          A-2193-08T4

[State v. Fuentes, 217 N.J. 57, 70 (2014)
(alteration in original) (quoting State v.
Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "trial judges have discretion to decide if
sentences should run concurrently or consecutively." Miller,
supra, 205 N.J. at 128.

In Yarbough, the Court identified the factors to be
considered in deciding whether to impose concurrent or
consecutive sentences:

> (1) there can be no free crimes in a system
> for which the punishment shall fit the
> crime;
>
> (2) the reasons for imposing either a
> consecutive or concurrent sentence should be
> separately stated in the sentencing
> decision;
>
> (3) some reasons to be considered by the
> sentencing court should include facts
> relating to the crimes, including whether or
> not:
>
> > (a) the crimes and their
> > objectives were predominantly
> > independent of each other;
> >
> > (b) the crimes involved separate
> > acts of violence or threats of
> > violence;
> >
> > (c) the crimes were committed at
> > different times or separate
> > places, rather than being
> > committed so closely in time and
> > place as to indicate a single
> > period of aberrant behavior;

A-2193-08T4

> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors;
>
> (5) <u>successive terms for the same offense should not ordinarily be equal to the punishment for the first offense</u>[.][7]
>
> [Yarbough, supra, 100 N.J. at 643-44 (footnote omitted) (emphasis added).]

"When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Miller, supra, 205 N.J. at 129.

It is clear that pursuant to Carey, supra, 168 N.J. at 431, and Molina, supra, even when the only Yarbough factor found by the sentencing court is the multiplicity of victims, that factor "is entitled to great weight and should ordinarily result in the imposition of at least two consecutive sentences." 168 N.J. at 443. As a result, we find no reason to disturb the judge's decision to impose consecutive sentences for the two murders.[8]

---

[7] A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by legislative action. See State v. Eisenman, 153 N.J. 462 (1998).

[8] We note, however, that the judge in this case never addressed any of the other Yarbough factors at all. "[A] trial court is expected to give 'a separate statement of reasons for its decision to impose consecutive sentences.'" Molina, supra, 168

(continued)

However, "[t]he fact that two consecutive terms of imprisonment should ordinarily be imposed in multiple-victims cases does not prevent the sentencing court from setting the base term of each sentence below the maximum provided by the Code." Carey, supra, 168 N.J. at 430. In Miller, supra, 108 N.J. at 122, a case that did not involve multiple victims, the Court said that "[w]here the offenses are closely related, it would ordinarily be inappropriate to sentence a defendant to the maximum term for each offense and also require that those sentences be served consecutively, especially where the second offense did not pose an additional risk to the victim." In State v. Pennington, 154 N.J. 344, 361-62 (1998), referring to Yarbough factor five, the Court said in remanding for resentencing after imposition of two consecutive maximum sentences, the trial court was "required to explain why a shorter second term for the same offense is not warranted if consecutive terms are reimposed."

_____

(continued)
N.J. at 442 (quoting State v. Miller, 108 N.J. 112, 122 (1987)). As the Court has noted, although "[c]rimes involving multiple deaths . . . represent especially suitable circumstances for the imposition of consecutive sentences[,] . . . '[t]hat does not mean that all consecutive sentencing criteria are to be disregarded in favor of fashioning the longest sentence possible.'" Carey, supra, 168 N.J. at 428 (quoting State v. Louis, 117 N.J. 250, 258 (1989) (alteration in original) (citations omitted).

We have affirmed the imposition of two consecutive maximum term sentences in a double homicide case. See, e.g., State v. Kelly, 406 N.J. Super. 332, 353 (App. Div. 2009) (affirming without discussion the imposition of two consecutive life sentences based upon the murder of two victims), affirmed on other grounds, 201 N.J. 471 (2010). However, we believe it is incumbent upon the judge to explain fully the justification for imposing such a sentence, particularly after, in this case, rejecting the State's argument that other specific aggravating factors were present and finding only the frequently-found aggravating factors three, six and nine applied. We also agree with defendant that the judge gave no explanation for the imposition of a consecutive term on the hindering charge. As a result, we remand the matter to the Law Division for re-sentencing.

We affirm defendant's conviction and remand the matter to the Law Division for re-sentencing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

34                                                          A-2193-08T4

_____

**OSTRER, J.A.D., dissenting.**

Upon review of the entire record, I am convinced the trial judge exceeded the boundaries of permissible questioning under N.J.R.E. 614 and our case law. The error was "clearly capable of producing an unjust result." R. 2:10-2. That is, "the possibility of injustice [was] 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Therefore, I respectfully dissent.

I.

I assume familiarity with the facts set forth in our prior decision. The majority agrees that the trial presented significant credibility issues for the jury. The State's principal witnesses gave multiple, inconsistent statements. They also had strong motives to curry favor from the State.

The State's theory was that defendant shot and killed Alexey Bautin and Sergey Barbashov, two white men, after mistaking them for a tall African-American man who had threatened him with a gun almost a month earlier, on October 1, 2003. The State established Bautin and Barbashov were killed while seated in a parked red 1999 Volkswagen Passat outside an

apartment complex in Woodbridge Township. The State's only eyewitness to the homicides, Jamil McKnight, admitted he retrieved the gun used, and accompanied defendant to the shootings. Defendant's girlfriend Sharhi Roberts, and a friend, Greg Wakefield, testified that defendant confessed to them. Ron Huff claimed he was in the car when defendant first spotted the men he thought were involved in the prior incident, and then decided to retrieve a firearm. Huff claimed he left the car before the homicides, but he later appeared at the scene.

The defense theory was that McKnight and another man, Sherrill Williams, participated in the shooting. Defense counsel argued that McKnight was threatened in the same early October incident in which defendant was threatened; McKnight had poor eyesight, making it more likely that he, not defendant, misidentified the victims. Williams said in an out-of-court statement that the gun removed from McKnight's house the night of the shooting belonged to McKnight, not defendant. The defense contended that each of the key incriminating witnesses had motives to lie, in order to avoid prosecution related to the homicides (in McKnight's case), or to curry favorable treatment in connection with other charges (in Roberts's and Wakefield's case).

II.

2

The trial court's questioning must be considered against this factual backdrop. At the risk of repetition with the majority opinion, an extensive review of the record is necessary to appreciate the full impact of the court's intervention.

The court's questioning fell into three major categories: (1) bolstering State witnesses; (2) eliciting evidence that supported the State's case, which the prosecutor herself did not elicit; and (3) expressing impatience with a reluctant State witness. The volume of the court's questioning was substantial. The court interrogated fifteen of the State's seventeen witnesses.[1]

The first two witnesses at trial were Woodbridge Police officers Vincent Totka and Michael Ng. Totka took a statement from defendant at the police station regarding the early October incident in which someone driving a burgundy Ford or Mercury pointed a handgun at defendant. Totka described defendant as a crime victim who had voluntarily come forward to make a statement. Totka noted defendant's father accompanied him to

[1] The State presented its case through the testimony of (1) six investigating officers — Vincent Totka, Michael Ng, Christopher Reahm, Mark Clements, John Haley, and Christopher Lyons; (2) three experts — ballistics expert Gary Mayer, and pathologists Frederick J. DiCarlo and Andrew Falzon; (3) Verizon's records custodian, Renada Lewis; and (4) seven other witnesses — Ronald Gordon Huff, Alexander Bautin, Ekaterina Vodolatskaya, Sharhi Roberts, David Robert Oakley, Jamil McKnight, and Greg Wakefield.

the police station, but defendant gave his statement without his father present. The taped statement was played for the jury. Cross-examination established that the gun was also pointed at others at the scene, whom the police did not question.

The judge then asked Totka why defendant's father was not present during the interview. Totka explained defendant was twenty-one years old, and did not need parental consent to give a statement. Although brief, the court's questioning may have alleviated concerns jurors may have had about the police behavior in taking defendant's statement without his father present. There was nothing unclear about Totka's testimony before the judge's questioning. The court simply chose to elicit additional facts that assisted the State.

Ng's focus was the automobile accident. He testified that defendant was asked to come in to discuss what Ng believed was his involvement in an accident. Ng said defendant "came in to report . . . that he was involved in a motor vehicle accident that we were investigating the night before." Ng identified motor vehicle accident reports, which were prepared based on defendant's information. Defendant told Ng that he struck two vehicles as he fled from the man who pointed a gun at him. Defendant described the man as a "black male, approximately six-two . . . ." Ng did not issue any summonses to defendant because he did not believe defendant was driving carelessly

under the circumstances. The defense asked one question on cross-examination, to establish that the Ford Taurus and Mercury Sable had similar body styles.

The judge then engaged Ng in questioning that lasted almost half the length of the State's direct examination. The judge elicited how Ng came to invite defendant into the station for questioning. In response to the court's numerous questions, Ng described his investigation, step by step. Ng testified he was dispatched to the scene of the motor vehicle accidents. He spoke to a witness, examined the two vehicles defendant struck, and then found a parked vehicle nearby that appeared to have been in a collision. After impounding the vehicle, a police search of the vehicle disclosed defendant's identification. Police then went to defendant's house, spoke to his father, and asked him to come into the police station for questioning.

These additional facts emphasized that defendant failed to report the incident immediately or voluntarily. See N.J.S.A. 39:4-130 (making it a motor vehicle violation to fail to report an accident involving, among other things, property damage of $500 or more). The questioning also highlighted that defendant did not take the initiative to report to police that he was threatened with a gun, a serious crime, which may have created the inference that defendant intended to address the threat himself. The judge's questioning established that police

effectively had to track defendant down to obtain his accident report.

In sum, with the first two witnesses, the judge established himself as an active questioner whose questions tended to support the State's case. Notably, the court gave no mid-trial instruction to the jury to disregard any implication that he favored the State's case.

The court elicited additional factual details from the next four witnesses: the Verizon records custodian Renada Lewis, who identified records of the 911 call; New Jersey State Police trooper Christopher Reahm, who presented the 911 recording, and described its method of storage; Alexander Bautin, who was in his apartment when he heard the shooting of his brother Alexey and his friend Sergey Barbashov; and Barbashov's girlfriend, Katerina Vodolatskaya, who testified about the victim's whereabouts before the shooting. Defense counsel declined cross-examination of Lewis and Reahm; posed one question to Bautin, to identify that his brother's car was a 1999 Volkswagen Passat; and briefly questioned Vodolatskaya to establish that Bautin had money problems with his business partner, who owned a gun.

The court pursued separate lines of questioning after defense counsel's turn. Many of the judge's questions were leading, which established the judge as a knowledgeable

6 A-2193-08T4

questioner. The information did not directly reflect negatively on defendant. It was undisputed that a drive-by shooter killed Bautin and Barbashov. However, the questioning maintained the judge's role as an active questioner who supplemented evidence in the State's case.

In questioning Huff for five pages of transcript, the judge addressed an apparent inconsistency in Huff's testimony, and emphasized facts that supported the State's theory of the case. Huff initially identified the occupants of the vehicle by their nicknames — "360" or "60," who was Ross; Sagacious, who was McKnight; and Boo, who was Williams. He was asked on direct regarding Sagacious, "Do you know that person's real name?" Huff said he did not. On cross-examination, counsel referred to "Jamil McKnight, a man you knew as Sagacious," but Huff repeated that he did not know Sagacious's or Boo's real names. The judge then interjected, "You don't know their real names?" and Huff again said no. Later in cross-examination, counsel questioned Huff referring only to McKnight, not Sagacious, and Huff had no difficulty responding. In the judge's separate examination, he returned to the issue, and allowed Huff to reiterate that he did not know Sagacious's real name, but thought that was his real name based on defense counsel's prompting.

The court's questioning also elicited details about the lighting around the apartments where the shooting took place.

These questions reinforced already clear and unambiguous testimony that the State had elicited on direct, and which the defense did not challenge on cross-examination. In so doing, the judge elicited testimony that supported the State's theory of the case: that defendant thought he was getting revenge on a man named Mitch, who pulled a gun on him on October 1, but instead accidentally shot two innocent men sitting in their car that night.

Sharhi Roberts was one of the two witnesses to whom defendant allegedly confessed. Roberts testified that the day after the shooting, defendant told her he shot the two men. About a year later, he again confessed to her, adding he intended to shoot Mitch, but shot the victims by mistake. She also asserted that defendant told her that Mitch previously threatened him with a gun. However, she also claimed that subsequent to the two confessions, defendant told her that he did not shoot the two men, and he only made up that he did.

The prosecutor confronted Roberts on direct examination with a prior statement to police, in which she did not mention the third conversation. She claimed that she did not disclose the conversation "because the officers [Lyons and Clements] didn't want to hear that" and her lawyer, David Oakley, told her "to tell them what they wanted to know and that's that." She asserted the officers "were harassing" her for her statement.

In return for her testimony, the officers informed the prosecutor of Roberts's cooperation, and the pending charges against her were dismissed. The prosecutor also elicited that Roberts testified at a trial of a different defendant in August 2007 — over which the same trial judge presided — and confirmed her statement to police, but did not mention the third conversation.

On cross-examination, defense counsel elicited Roberts's claim that Lyons and Clements harassed her. The court intervened in counsel's questioning, expressing impatience, and at one point stating that "we" need specifics.

> Q    Okay.  So you've been dealing with Clements and Lyons for a while, haven't you?
>
> A    Yes.
>
> Q    Okay.  Have they harassed you in the past?
>
> A    Yes.
>
> Q    Can you describe for the jury the manner in which they harassed you with as much specificity as you can.
>
> A    Okay.  They came to my house. I've been evicted from places.
>
> THE COURT:  I'm sorry.  Came to your house and what?
>
> A    They came to my house.  Harassed me numerous times.
>
> THE COURT:  In other words, the question is we need specifics.  What did they do?

Specifically what did they do?  What did they say?  What did they do?

A    Well --

THE COURT:  Okay.

A    They --

THE COURT:  They came to your house.  What else?

. . . .

Q    All right.  Sharhi, describe how you were harassed.  I don't just mean the cops showed up.  How many times did they come, what did they say to you and so forth, things like that.

. . . .

Q    Where were you working at the time?

A    Perth Amboy Shop-Rite on Convery Boulevard.

Q    Okay.  So when's the first time that you can remember the police coming to you and harassing you?

A    The first time I remember was my father's house, on 19 Walter Drive, Woodbridge.

THE COURT: When?  When?  When?  When?  Not where.

THE WITNESS:  I can't remember the exact day.

THE COURT:  Well, was it like -- was it before August -- before October 30th, 2003, or was it after October 30th?

THE WITNESS:  It was after.

THE COURT:   Was it a month after, a year after?

THE WITNESS:   A year, a year -- almost two years -- it was a little after November, I want to say -- I want to say '05 --

THE COURT:  Okay.

THE WITNESS:   -- 6, November.

THE COURT:  November 2005.

Q    Did the police ever offer you anything for your testimony?

A    Yes.  Yes.  Numerous times.

The court intervened during cross-examination about the pre-interview, in which defense counsel sought to establish that officers told Roberts to discuss only the two confessions, and not the subsequent denial.

Q    Earlier you mentioned that when talking to the police, and by the police I mean basically the Woodbridge police, the Middlesex County Prosecutor's Office, there were portions of your conversations that were unrecorded?

A    Yes.

Q    Was there some sort of preinterview that occurred before the recording begins?

A    Yes.  He stated that he wanted me --

THE COURT: No.  No.  No.  Question was was there portions of the interview that was unrecorded.  Yes?

THE WITNESS:  yes.

THE COURT: Next question.

Q    That was during the preinterview?

THE COURT:  The preinterview is -- in other words, did they talk to you before they actually put the machine on and recorded your statement?

THE WITNESS:  Yes.

THE COURT:  Okay.  So you had a preinterview?

THE WITNESS:  Yes.

THE COURT:  Okay.

Q    What did they tell you in the preinterview or at any time when the recorder wasn't on?

MS.  DAVISON:    Again,  Judge,  this  is hearsay.

THE COURT:  Overruled.

A    At the time, the day -- the day I made -- the day of January --

THE COURT:  This is January 26th, 2006, your attorney was there?

THE WITNESS:  Yes.

THE COURT:  And what did they tell you?

A    They asked me to go back to the time that my sister had stated -- made the statement previous.  They wanted me to go back to that time and recall of those two times that my sister had mentioned originally to Chris Lyons and Woodbridge Police Department of November -- in November.  They wanted --

Q    Is it fair to say you were limited to those two times?

A    Yes.

Q    And then -- and then you were told that there would be consequences if you changed your story out of what was just said?

A    Yes.

Officer Lyons initially testified on direct regarding his arrival on the scene of the homicides, and his initial observations of the two victims and their car. He testified he secured Huff for questioning by detectives. The judge interjected several friendly questions, in the midst of the direct examination, prompting the witness to clarify a point, spell a name, describe a location, explain an acronym, indicate the meaning of a gesture, and expand upon a comment. In so doing, the court appeared to work in tandem with the prosecutor.

Lyons's cross-examination was brief. It focused on the fact that police did not test Huff for gunpowder residue. The court sustained the State's objection when defense counsel inquired about other aspects of the State's investigation, which were outside the scope of direct.

The judge then engaged Lyons in over six pages of questioning. By contrast, the direct examination consumed nineteen pages of transcript, including the judge's interjected questioning. He elicited additional details about the officer's

13

efforts to secure the crime scene. Most significantly, the judge elicited testimony regarding the lighting conditions at the scene of the crime. Lyons testified the area was "[f]airly dark," there were no streetlights in the area, and "very little" light was coming from a nearby building. These facts supported the State's theory that the shooter misidentified the victims in part because of the dark conditions.

Officer Haley testified about his crime scene investigation, including his collection of bullets and spent shells, and provided a critique of gunshot residue testing. During the direct examination, the judge repeatedly interjected questions to clarify or supplement information elicited by the State. The judge also engaged in two separate rounds of friendly questioning of the witness, consuming over twelve pages of transcript. Although the information elicited did not appear to be directly damaging to defendant, the judge did highlight the depth of the witness's experience, and again appeared to be in sync with the prosecution.

The State called Lyons again to testify about how the investigation of the dual homicides, which had turned cold after failing to uncover any suspects, was revived in 2005, after the police received information in early November 2004. The same week, Lyons interviewed Roberts and her sister. He discussed his subsequent efforts during 2005 and 2006 to obtain statements

14                                                    A-2193-08T4

from Roberts, Huff, McKnight, Wakefield, and Williams. After police arrested defendant and charged him with the murders in September 2006, Lyons continued his efforts with the five.

Cross-examination was vigorous, and highlighted inconsistencies in the statements of the State's witnesses. Defense counsel also established that Lyons threatened some witnesses, telling them they could be witnesses or they could be defendants. Lyons admitted that such tactics were coercive, but justified, because he was "using leverage against people who had lesser charges or lesser crimes to get the information about this double homicide."

At the end of cross-examination, the judge engaged Lyons in a line of questioning premised on his assumption that Roberts had been charged with making a false report to police before the State suspected defendant committed the murders. Lyons corrected the judge stating that defendant became a suspect in late 2004; the charges were lodged against Roberts in 2005; and she thereafter gave her formal statement incriminating defendant, which prompted Lyons to contact the municipal prosecutor on her behalf. Nonetheless, the judge's effort — albeit unsuccessful — to establish the lack of a connection between the charges against Roberts and efforts to secure her cooperation, constituted another effort to establish facts favorable to the State's case. Moreover, the friendly tenor of

15                                                    A-2193-08T4

the judge's questions of Lyons contrasted with his impatience in questioning Roberts.

The judge asked no questions of David Oakley, Roberts's attorney. Oakley denied he told his client to tell officers what they wanted to hear, but he testified that Roberts received harsher treatment — in terms of the bail set, and the State's willingness to prosecute — for her own alleged offense, because the State was interested in securing her cooperation.

During the direct examination and extensive cross-examination of Jamil McKnight, who claimed to have witnessed the shooting, the judge's involvement was limited to interjecting brief clarifying questions. The judge also overruled several State objections on cross-examination.

The judge played a similar role during the testimony of Greg Wakefield. While separate gun charges were pending against Wakefield, he told police in two formal statements in April 2005 that defendant confessed to him. When the charges were resolved in March 2008, Wakefield recanted.

Ballistics expert Gary Mayer testified that the collection of spent shell casings found at the scene matched each other and were fired from the same gun. Over the course of fifteen pages of transcript, the court asked both clarifying and substantive questions, some leading, assisting in Mayer's presentation.

Mayer testified that he had also tested a separate group of shells from another case. He determined they matched each other, but not the shells of the other group. The judge asked, "So then you're saying that there were two different weapons used, is that right?" After Mayer answered affirmatively, the judge called counsel to sidebar. The prosecutor explained that the State's position was that only one gun was used in the homicides of Bautin and Barbashov, and the second group of shells were from a different investigation. The judge then advised the prosecutor that the jury was likely confused, and advised the prosecutor that she pose clarifying questions. However, before the prosecutor did so on redirect, the court continued with over thirteen pages of questioning, focusing on the properties of semi-automatic weapons — the type used in the homicides — and the differences between them and revolvers. At one point, the judge used the collective pronoun "us" in responding to an answer from Mayer, stating, "Okay. Okay. All right. That's not going to help us. You'll have to — Prosecutor will have to explain that."

The trial judge also took an active role in the questioning of DiCarlo, who performed the autopsy of Bautin, and Falzon, who performed the autopsy of Barbashov. A key point of the medical examiners' testimony was that the victims were hit by bullets shot from the victims' height — which was consistent with a

drive-by shooting. The judge interjected questions with increasing frequency during the State's examination. In addition to clarifying DiCarlo's testimony, the court elicited supplementary information, often through leading questions. Defense counsel declined cross-examination of both witnesses, yet the court engaged in six pages of additional questioning of DiCarlo and one page of additional questioning of Falzon.

A principal focus of Clements's testimony was his response to Wakefield's claim that he was unduly pressured by the officers during the interrogation preceding his April 7, 2005 statement. The interrogation began in the late afternoon, and Wakefield gave his formal statement shortly before midnight. Wakefield also mentioned that he was subjected to a polygraph test. Clements defended his interrogation techniques, and also asserted that Wakefield was not subject to his intense questioning for the whole time period, because he was before the polygrapher for about four hours.

The judge was restrained during most of the direct examination of Clements. However, at one point during the direct examination, the judge overruled a well-founded, albeit belated objection, and interjected a properly phrased question:

> Q    Was Mr. Wakefield upset during the preinterview or the actual formal statement?
>
> A    Yeah. Mr. Wakefield did cry. He was crying at times during the

interview process based on the fact that it was our belief because he was implicating his friend in the double murder.

THE COURT: Sir, they can't hear you. You're going to have to get into that microphone and don't worry about looking at the jury. Look – speak into the microphone so they can hear you. Start again.

THE WITNESS: My apology.

THE COURT: Thank you.

A   Could I have the question again please?

THE COURT: Sure.

Q   Was Mr. Wakefield upset at any time during the preinterview or during the formal statement?

DEFENSE COUNSEL: Objection, Judge. Calls for Mr. Wakefield's state of mind.

THE COURT: No. Did he appear to be upset?

THE WITNESS: Yes, sir.

THE COURT: Thank you. Go ahead. Tell the jury how he appeared.

A   He was crying at times during the interview. And it was our belief that he was crying because he was implicating his friend in the double murder.

During cross-examination, defense counsel presented evidence that tended to establish that Wakefield was with the polygrapher significantly less time than Clements claimed.

A-2193-08T4

Defense counsel elicited that a Miranda card was executed by Wakefield and the polygrapher at 8:38, and the polygraph ended at shortly before 11:00, meaning Wakefield was gone for slightly over two hours.

The judge then called a sidebar, and curtailed the cross-examination after noting the possibility that the polygrapher could have been engaged in various discussions with Wakefield before he signed the Miranda card. Consistent with this point, during the judge's own line of questioning, he established that the polygrapher and Wakefield were in a separate room, and Clements was not privy to what transpired there. The implication was created that the polygrapher may have spent a significant amount of time explaining the polygraph process before obtaining Wakefield's Miranda waiver and beginning questioning.

During the defense case, the judge was restrained. He did not pursue a separate line of questioning of McPhatter or defendant, and his interjections were largely for the purpose of clarification.

III.

A trial judge's "broad discretion" to participate in the questioning of a witness, State v. Ray, 43 N.J. 19, 25 (1964), is limited by the court's obligation to maintain the appearance and reality of impartiality. Taffaro, supra, 195 N.J. at 445.

"[I]n exercising their discretionary power, judges must take care not to influence the jury by signaling doubt about a witness's credibility.  To do otherwise might place the court's impartiality in question and affect the trial's outcome." Ibid.; see also State v. O'Brien, 200 N.J. 520, 534 (2009) ("[P]articularly in the context of a jury trial" a judge must ensure that he "does not telegraph to the jury any partiality to a given party's side."); Ray, supra, 43 N.J. at 24 (discussing the "necessity of judicial self-restraint and the maintenance of an atmosphere of impartiality.") (internal quotation marks and citation omitted); State v. Guido, 40 N.J. 191, 207-08 (1963).

A trial judge must scrupulously avoid crossing the line separating appropriate and inappropriate questioning.  On the one hand, the court's questioning may serve a salutary purpose. The Court has identified four goals of a judge's questioning:

> [I]t is proper, and even encouraged, for a trial judge to step in [1] when a party's basic rights are being threatened, [2] when expedition is necessary to prevent a waste of judicial time/resources, [3] when testimony requires clarification, or [4] when a witness appears to be in distress or is having trouble articulating his/her testimony.
>
> [O'Brien, supra, 200 N.J. at 534 (internal citations omitted).]

On the other hand, a trial judge must avoid "'undue interference, impatience, or participation in the examination of

witnesses, or a severe attitude . . . toward witnesses . . . .'" Ibid. (quoting Guido, supra, 40 N.J. at 207). A judge may not "take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant and his witnesses." Id. at 535 (quoting United States v. Bland, 697 F.2d 262, 265 (8th Cir. 1983)). A judge "should not press defendant when the meaning of their responses is 'perfectly plain'". Taffaro, supra, 195 N.J. at 451 (quoting Guido, supra, 40 N.J. at 208-09 n.2). Such questioning "may express incredulity and prejudice a defendant." Just as a court's questioning should not express incredulity in one side's witness, it should not bolster or rehabilitate a witness on the other side. O'Brien, supra, 200 N.J. at 539-40 (criticizing trial judge's questioning that "help[ed] to counter defendant's challenge" to a State witness).

Our Court has recognized that when a judge violates these limitations, the risk of prejudice is great. See Guido, supra, 40 N.J. at 208. "The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical." Ibid. "A judge's slightest indication that he favors the government's case can have an immeasurable effect upon a jury." O'Brien, supra, 200 N.J. at 535 (quoting Bland, supra, 697 F.2d at 265-66).

"When a judge questions a witness in such a way that he takes over the role of the prosecutor, it can give the jury the impression that the judge does not believe the witness, and that impression can deny the defendant his right to a fair trial." Ibid. (citing United States v. Filani, 74 F.3d 378, 385 (2d Cir. 1996)). "Where the court takes over the role of the prosecutor" and displays bias, reversal is required." Filani, supra, 74 F.3d at 385 (internal citations omitted). If it appears to the jury that the judge believes the accused is guilty, the defendant will be "deprive[d] of the fair trial to which he is entitled." Ibid.

In Taffaro and O'Brien, our court found that the trial judge's inappropriate questioning constituted plain error. Taffaro, supra, 195 N.J. at 454; O'Brien, supra, 200 N.J. at 539-40 (reversing based on plain error). "In light of the trial judge's esteemed position in the courtroom and the central role that defendant's credibility played in this trial, suggesting disbelief of defendant's testimony could well have had a critical impact on the verdict." Taffaro, supra, 195 N.J. at 454. Furthermore, our Court has repeatedly held that instructing a jury, in accord with the model jury charge, not to be influenced by the judge's questioning is insufficient to

"cure the harm" of inappropriate questioning.[2]  O'Brien, supra, 200 N.J. at 539 (repeated mid-trial instructions that judge's questions were not intended to favor one side were insufficient); Taffaro, supra, 195 N.J. at 454 ("We are not persuaded that the jury instruction was sufficient to cure the harm."); Guido, supra, 40 N.J. at 208.

In assessing whether a judge's intervention constitutes plain error, a reviewing court must consider the judge's interventions in the context of the record as a whole.  See, e.g., United States v. Rivera-Rodriguez, 761 F.3d 105, 111, 113 (1st Cir. 2014), cert. denied, ___ U.S. ___, 135 S. Ct. 1573, 191 L. Ed. 2d 656 (2015); United States v. Ottaviano, 738 F.3d 586, 596 (3d Cir. 2013), cert. denied, ___ U.S. ___, 134 S. Ct. 1922, 188 L. Ed. 2d 945 (2014).  In so doing, the court weighs the cumulative impact of multiple interventions, yet avoids

---

[2] Model Jury Charge (Criminal), "Criminal Final Charge" (June 2015) states:

> The fact that I may have asked questions of a witness in the case must not influence you in any way in your deliberations.  The fact that I asked such questions does not indicate that I hold any opinion one way or the other as to the testimony given by the witness.  Any remarks made by me to counsel or by counsel to me or between counsel, are not evidence and should not affect or play any part in your deliberations.

magnifying the impact of isolated instances. <u>Rivera-Rodriguez</u>, <u>supra</u>, 761 <u>F.</u>3d at 113, 122.

The appellate court must consider the impact of the judge's questioning on the key issues before the jury. For example, prejudice is heightened when the success of the State's case depends on the jury's credibility determinations, and the judge conveys a view on that issue. <u>See</u> <u>Taffaro</u>, <u>supra</u>, 195 <u>N.J.</u> at 451 (internal quotation marks and citation omitted) ("[I]f a judge's questions suggest disbelief, the impact upon the juror may be critical. This is especially true when the outcome of a case rests primarily and necessarily on the jury believing or rejecting a defendant's version of events."). A reviewing court may consider the weight of other evidence in the case to determine whether the judge's interventions were prejudicial. <u>See</u> <u>Ottaviano</u>, <u>supra</u>, 738 <u>F.</u>3d at 597 (finding judge erred in its questioning of the defendant, but declining to reverse in light of "overwhelming documentary and testimonial evidence of guilt . . . .").

The volume of a judge's questioning is also relevant in assessing whether it improperly influenced the jury. <u>Taffaro</u>, <u>supra</u>, 195 <u>N.J.</u> at 453; <u>see also</u> <u>Ottaviano</u>, <u>supra</u>, 738 <u>F.</u>3d at 596 (stating a court may consider "the portion of the trial record affected . . . ."). However, "it is the impact of the

court's questions, and not the number of minutes they lasted, which matters most." Taffaro, supra, 195 N.J. at 454.

"Whether the judge appeared to treat both sides evenhandedly" is a factor as well. Ottaviano, supra, 738 F.3d at 596. If a judge intervened actively, but evenhandedly, the impact on the jury may be less significant than when the judge appears to intervene disproportionately on behalf of one side. See Rivera-Rodriguez, 761 F.3d at 113 ("[W]e have stressed that where the judge participates actively, the judge's participation must be balanced . . . .") (internal quotation marks and citation omitted); Ottaviano, supra, 738 F.3d at 596 (the court must balance the degree of questioning in each side's case-in-chief "to determine whether the trial judge's comments have pervaded the overall fairness of the proceeding.") (quoting United States v. Wilensky, 757 F.2d 594, 598 (3d Cir. 1985)).

The prejudicial impact of a judge's intervention extends not only to the evidence the judge elicits, but also to the elicitation itself. By intervening in questioning, a judge may convey to the jury that he finds a witness credible and trustworthy, or the opposite; he finds one side's case more persuasive than the other; and he expects the jury to return a verdict in accord with his apparent preference. Whether the judge subjectively intends to convey these messages is not relevant to the analysis.

> [T]he judge's participation, whether in the form of questions or of comments, is likely to have a disproportionate and distorting impact. The jury is likely to discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize his role.
>
> [Marvin E. Frankel, The Search for Truth: An Umpireal View, 123 U.Pa.L.Rev. 1031, 1043 (1975).]

The extent to which the judge used leading questions is also a factor, because a judge's leading questions may convey to the jury that he already is aware of certain facts, and seeks only the witness's confirmation. Under such circumstances, jurors may view the judge as more knowledgeable about the facts in issue than they are. As a result, the judge's questioning may infect the fairness of the trial as a whole.[3]

## IV.

The judge's extensive questioning did not further any of the four purposes identified in O'Brien, supra, 200 N.J. at 534. No party's rights were threatened, necessitating court intervention. Rather than conserve judicial time or resources, the court's questioning generally extended the length of

---

[3] We recognize the inherent difficulty in assessing the impact of a judge's excessive intervention based on a cold transcript. One commentator has argued that "[t]he effect of a trial judge's improper intervention is immeasurable." Michael Pinard, Limitations on Judicial Activism, 33 Conn.L.Rev. 243, 293 (2000). Consequently, he and others advocate a per se rule of reversal where a judge intervenes improperly. Id. at 298-99.

testimony. No witness, such as a child, appeared to be in distress. Cf. State v. Riley, 28 N.J. 188, 201, cert. denied, 361 U.S. 879 (1959). Finally, although the court did ask questions to clarify some answers, or to assure that a witness could be heard, the overwhelming majority of the questions served an inappropriate purpose.

The evidence elicited through the court's questioning generally supplemented or reinforced evidence presented by the State. The court alone established that officers had to ask defendant to visit the station to report his multiple collisions, and only then did defendant report that a person pointed a gun at him. This left the jury free to infer that defendant did not intend to seek police assistance in addressing the gun pointing. The judge's questioning excused the interrogation of defendant without his father and highlighted the poor lighting in the area where defendant allegedly mistakenly identified the victims. The judge gave Huff the opportunity to rehabilitate himself, after Huff denied knowing Sagacious's real name, yet responded to questions referring only to Jamil McKnight. The court also elicited testimony to support an inference that Wakefield may have been in the presence of the polygrapher longer than the Miranda cards emphasized by the defense might have indicated.

The court's questioning was far from evenhanded. The court did not subject the State's witnesses to rigorous or challenging questions. In one instance, in which defense counsel raised a well-founded, although belated objection to a question posed to Clements, the judge himself rephrased the prosecutor's question and elicited a response from the witness. The court's questions for the State's witnesses were consistently friendly, with the glaring exception of the court's questioning of Roberts, who testified that Ross recanted his prior confessions. The court expressed impatience and irritation, if not outright incredulity.

The judge repeatedly interjected substantive questions during the prosecutor's direct or redirect examination — but not during the defense's cross-examination. The judge thereby placed himself in a position where the jury might have viewed him as working in tandem with the State. The judge's use of the pronoun "we" and "us" in questioning was at best ambiguous, and at worst, an unconscious alignment of himself with the State. Even when the testimony elicited by the judge did not directly implicate defendant, the court's separate examinations supplemented the State's case. The sheer volume of the court's questioning was substantial.

The overall impact of the judge's participation was to convey partiality in favor of the State's case. I am confident

A-2193-08T4

that this was not the judge's intent; his purpose was to elicit facts in the search for the truth. However, viewed objectively, the jurors could have reasonably concluded, based on the extent and nature of the judge's questioning, that the judge favored the State's case. Enhancing the judge's already significant position before the jury, the judge also frequently asked leading questions, reflecting that the judge possessed prior knowledge of relevant facts.

V.

It is not easy to determine whether a judge's excessive and inappropriate questioning constitutes plain error. See United States v. Hickman, 592 F.2d 931, 932 (6th Cir. 1979) ("The law in this area is as easy to state as it is difficult to apply."). A defendant is entitled to a "fair trial, but not a perfect one." State v. R.B., 183 N.J. 308, 333-34 (2005) (internal quotation marks and citation omitted).

I recognize, as the majority highlights, the judge's intervention here was unlike that which compelled reversal in Taffaro or O'Brien. In O'Brien, supra, 200 N.J. at 526-31, the trial judge engaged in an incisive cross-examination of the defendant and his expert. Similarly, in Taffaro, supra, 195 N.J. at 453-54, the court cross-examined the defendant himself, suggesting the court disbelieved him.

Here, the judge did not directly challenge defendant or his alibi witness. Nonetheless, viewing the record as a whole and weighing the cumulative impact of the judge's intervention, I believe prejudicial error resulted. The judge did not intervene in isolated instances. Rather, he assumed an activist role from the start, interjecting questions during the State's direct examination, and pursuing his own separate lines of questioning of numerous State witnesses. Further, there is nothing in O'Brien or Taffaro that should serve to exclude their applicability to cases where the trial judge participates extensively in the State's case, but does not interfere directly with defense witnesses. The fact that the judge here chose not to question defendant or his alibi witnesses does not dispose of defendant's claim he was not afforded a fair trial.

The judge elicited evidence that tended to support the State's case, including the appropriateness of excluding defendant's father from defendant's interrogation; defendant's disinclination to seek the police's help after the gun-pointing incident; the lighting conditions at the murder scene; and the possibility that Wakefield was present with the polygrapher longer than the Miranda cards may have indicated.

The prejudice caused by the judge's intervention goes beyond the substantive evidence elicited. As a consequence of the judge's intervention, the jury likely perceived him to favor

the State's case. The judge created this perception by intervening in tandem with the prosecution, posing friendly questions to the State's witnesses, eliciting information consistently favorable to the State's case, and bolstering the credibility of State witnesses. As a consequence of the judge's leading questions, and his prior involvement in apparently related proceedings, the jury likely viewed the judge as privy to facts that the jury was not.

The perception of partiality may be created as much by constructive questioning during the State's case, as damaging questions in the defense case. The judge did not challenge defendant or his alibi witness, as did the judge in Taffaro and O'Brien. Nonetheless, by his extensive and unwarranted participation in the questioning of the State's witnesses, the judge created the impression of favoring the State in a close case.

The evidence of defendant's guilt was not insignificant. Neither was it overwhelming. The State's case depended on the jury finding credible a group of witnesses who had strong motives to lie, and who gave inconsistent statements. The defense plausibly argued that the sole alleged eyewitness to the homicides — McKnight — had a similar motive to seek revenge against Mitch. Because of his poor eyesight, he was more likely to mistake the victims for his intended target. Further, he

32 A-2193-08T4

admittedly took steps to destroy evidence of homicides he claimed he did not commit. And, perhaps most importantly, he was admitted to the pre-trial intervention program in return for his cooperation.

The two witnesses who claimed defendant confessed to them — Roberts and Wakefield — gave inconsistent statements and alleged police harassed or pressured them. At the same time, the two had an interest in currying favor with the State in connection with separate charges pending against them. Moreover, the pending charge against Roberts was for making false accusations against defendant's family.

Defendant's credibility was not helped by his inconsistent statement to his father from the jail after his arrest. Yet, the inconsistency may not have been as harmful as the majority perceives. The jury may have found understandable a son's initial unwillingness to admit to his father involvement in the events leading to a homicide.

Certainly, we are obliged to consider "that the failure to object may suggest the error was of no moment in the actual setting of the trial." Macon, supra, 57 N.J. at 341. However, I do not view defense counsel's failure to object as a strong indication that the judge's questioning was harmless. With the exception of his interrogation of Roberts, the judge's questioning may not have seemed so antagonistic towards

defendant as to prompt an objection. Rather, the court's questioning had a cumulatively prejudicial impact.

Furthermore, a defense attorney may have a natural hesitancy to object to a judge's own questions to avoid alienating the judge or jury, especially if the judge responded critically to the objection. The opportunity to repeatedly seek a sidebar would not necessarily alleviate an attorney's concern. See United States v. Lanham, 416 F.2d 1140, 1145 (5th Cir. 1969) (reversing conviction based on court's inappropriate questioning, noting that defendant's counsel "might hesitate to make objections and reserve exceptions to the judge's examination, because, if they make objections . . . it will appear to the jury that there is direct conflict between them and the court.") (internal quotation marks and citation omitted); Pollard v. Fennell, 400 F.2d 421, 424 (4th Cir. 1968) (noting "the natural reluctance of counsel to object to the court's questions"); United States v. Hill, 332 F.2d 105, 106 (7th Cir. 1964) (describing "difficult and hazardous predicament" of defense counsel who needs to object to judge's questions in the presence of the jury); In re United States, 286 F.2d 556, 561 (1st Cir. 1961) (stating counsel may "think twice" before objecting to a judge's question, and "counsel runs the risk . . . of comment by the judge before the jury implying that he is seeking to cut off legitimate inquiry"), rev'd sub nom on

other grounds, <u>Fong Foo v. United States</u>, 369 <u>U.S.</u> 141, 82 <u>S. Ct.</u> 671, 7 <u>L. Ed.</u> 2d 629 (1962); <u>Kennedy v. State</u>, 280 <u>N.E.</u>2d 611 (Ind. 1972).

The jury was much better positioned than this court, with its reliance on a cold written record, to assess the credibility of these witnesses. The jury apparently found the issue challenging, based on the length of the jury's deliberations, and the extensive readbacks it requested of Roberts's and Oakley's testimony. I do not share the majority's view that the judge's influence may have dissipated during the jury's lengthy deliberations. The greater risk is that the judge's questioning firmly shaped the jurors' perspectives, which remained a continuing factor throughout the deliberations.

In sum, when a judge sheds the mantle of impartiality, the defendant's right to a fair trial is at risk. The measurement of prejudice is a delicate task. Under the circumstances of this case, I conclude that the judge's extensive and inappropriate questioning, and the resulting appearance that he favored the State's case, raises a "reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." <u>Macon</u>, <u>supra</u>, 57 <u>N.J.</u> at 336. Consequently, his conviction should be reversed and he should be granted a new trial.

Therefore, I respectfully dissent.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION